IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABDUL RAUF OMAR MOHAMMED    )
ABU AL QUSIN    )
    )
    )
Petitioner,    )
    )
v.    )    Civil Action No. 05-1220 (RMU)
    )
GEORGE W. BUSH, *et al.,*    )
    )
Respondents.    )
    )
_____    )

## DECLARATION OF TERESA A. McPALMER

Pursuant to 28 U.S.C. § 1746, I, Commander Teresa A. McPalmer, Judge Advocate

General's Corps, United States Navy, hereby state that to the best of my knowledge, information,

and belief, the following is true, accurate and correct:

1.     I am the Legal Advisor to the Office for the Administrative Review of the

Detention of Enemy Combatants at U.S. Naval Base Guantanamo Bay, Cuba (OARDEC). In

that capacity I am an advisor to the Director, Combatant Status Review Tribunals.

2.     I hereby certify that the documents attached hereto constitute a true and accurate

copy of the portions of the record of proceedings before the Combatant Status Review Tribunal

related to petitioner Abdul Rauf Omar Mohammed Abu al Qusin that are suitable for public

release. The portions of the record that are classified or considered law enforcement sensitive are

not attached hereto or were redacted by an OARDEC staff member. This staff member also

redacted information that would personally identify certain U.S. Government personnel and

foreign nationals in order to protect the personal privacy and security of those individuals.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 16 august 2005

Teresa A. McPalmer
CDR, JAGC, USN



# Department of Defense
## Director, Combatant Status Review Tribunals

OARDEC/Ser: 742

23 JAN 2005

FOR OFFICIAL USE ONLY

From:  Director, Combatant Status Review Tribunal

Subj:  **REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN # 709**

Ref:   (a) Deputy Secretary of Defense Order of 7 July 2004
       (b) Secretary of the Navy Order of 29 July 2004

1. I concur in the decision of the Combatant Status Review Tribunal that Detainee ISN #709 meets the criteria for designation as an Enemy Combatant, in accordance with references (a) and (b).

2. This case is now considered final and the detainee will be scheduled for an Administrative Review Board.

J. M. McGARRAH
RADM, CEC, USN

Distribution:
NSC (Mr. John Bellinger)
DoS (Ambassador Prosper)
DASD-DA
JCS (J5)
SOUTHCOM (CoS)
COMJTFGTMO
OARDEC (Fwd)
CITF Ft Belvoir

FOR OFFICIAL USE ONLY

UNCLASSIFIED

14 Jan 05

MEMORANDUM

From: Assistant Legal Advisor
To:   Director, Combatant Status Review Tribunal
Via:  Legal Advisor      𝒥𝒫𝒰

Subj: LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
      FOR DETAINEE ISN #709

Ref:  (a) Deputy Secretary of Defense Order of 7 July 2004
      (b) Secretary of the Navy Implementation Directive of 29 July 2004

Encl: (1) Appointing Order for Tribunal #12 of 6 Dec 2004
      (2) Record of Tribunal Proceedings

1.  A legal sufficiency review has been completed on the subject Combatant Status Review
Tribunal in accordance with references (a) and (b).  After reviewing the record of the Tribunal, I
find that:

    a.  The detainee was properly notified of the Tribunal process and elected to participate
by attending the CSRT, by providing a unsworn statement to the board, responding to the
summary of evidence contained in Exhibit R-1, and by responding to additional questions
posed by the CSRT.  *See* Encl. (2) at Enclosure (3).

    b.  The Tribunal was properly convened and constituted by enclosure (1).

    c.  The Tribunal substantially complied with all provisions of references (a) and (b).

    d.  The detainee did not request that any documentary evidence be produced.  The
detainee did request that four witnesses be produced by the CSRT to speak on the
detainee's behalf.  *See* Exhibit D-a.  The CSRT determined that two of the witnesses
were in Libyan jails, and that the remaining two lived in Libya.  The CSRT determined
that none of these witnesses were reasonably available because the U.S. has had no
diplomatic relationship with Libya since 1988, and therefore, had no way to contact
Libyan officials to relay the request.  However, the record does contain evidence to
demonstrate that the U.S. has allowed Libya to recently reopen an "Interest Section" in
the United States following Libya's compliance with the United Nations Security Council
Resolution that led to economic sanctions against Libya that lasted from 1988 through
earlier 2004.

    Notwithstanding, it appears that even if the witnesses had been called, the CSRT would
have reached the same determination that the detainee was an enemy combatant.

UNCLASSIFIED

UNCLASSIFIED

Subj:   LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
FOR DETAINEE ISN # 709

Specifically, the detainee proffered that the two incarcerated witnesses, and one of the
Libyan civilians would support the detainee's contention that he was never a member of
the Libyan Islamic Fighting Group ("LIFG").[1]  Thus, if the witnesses were called, their
testimony would only be considered to dispel the allegations contained in paragraph 3.5
of Exhibit R-1.  A review of the record clearly reveals, however, that a preponderance of
the remaining evidence supports the determination reached by the CSRT.  Therefore, the
denial of detainee's witness request did not prejudice the detainee.

g.  The Tribunal's decision that detainee #709 is properly classified as an enemy
combatant was unanimous.

h.  The detainee's Personal Representative was given the opportunity to review the
record of proceedings, and declined to submit post-tribunal comments to the Tribunal.

2.  The proceedings and decision of the Tribunal are legally sufficient and no corrective action is
required.

3.  I recommend that the decision of the Tribunal be approved and the case be considered final.

KAREN M. GIBBS
CDR, JAGC, USNR

---

[1] The detainee did not provide a proffer for the fourth witness' testimony.  See Exhibit D-a.  Nor did he provide
addresses for either of the two civilian witnesses.  Therefore, the CSRT properly determined that the witnesses were
not reasonably available.

2

UNCLASSIFIED



**HEADQUARTERS, OARDEC FORWARD**
GUANTANAMO BAY, CUBA
APO AE 09360

06 December 2004

MEMORANDUM FOR DIRECTOR, CSRT

FROM:  OARDEC FORWARD Commander

SUBJECT:  CSRT Record of Proceedings ICO ISN# 709

1. Pursuant to Enclosure (1), paragraph (I)(5) of the *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba* dated 29 July 2004, I am forwarding the Combatant Status Review Tribunal Decision Report for the above mentioned ISN for review and action.

2. If there are any questions regarding this package, point of contact on this matter is the undersigned at DSN ███████.

CHARLES E. JAMISON
CAPT, USN



# Department of Defense
## Director, Combatant Status Review Tribunals

29 Sep 04

From:  Director, Combatant Status Review Tribunals

Subj:  APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL #12

Ref:  (a) Convening Authority Appointment Letter of 9 July 2004

By the authority given to me in reference (a), a Combatant Status Review Tribunal established by "Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base, Cuba" dated 29 July 2004 is hereby convened. It shall hear such cases as shall be brought before it without further action of referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

<u>MEMBERS</u>:

▆▆▆▆▆▆▆▆▆▆ Colonel, U.S. Marine Corps Reserve; President

▆▆▆▆▆▆▆▆▆▆, Lieutenant Colonel, JAGC, U.S. Army; Member (JAG)

▆▆▆▆▆▆▆▆▆▆, Lieutenant Colonel, U.S. Air Force; Member

J. M. McGARRAH
Rear Admiral
Civil Engineer Corps
United States Navy

SECRET//NOFORN//X1

### (U) <u>Combatant Status Review Tribunal Decision Report Cover Sheet</u>

(U) This Document is UNCLASSIFIED Upon Removal of Enclosures (2) and (4).

(U) TRIBUNAL PANEL:   #12

(U) ISN#:   709

Ref:    (a) (U) Convening Order for Tribunal #12 of 29 September 2004 (U)
     (b) (U) CSRT Implementation Directive of 29 July 2004 (U)
     (c) (U) DEPSECDEF Memo of 7 July 2004 (U)

Encl:   (1) (U) Unclassified Summary of Basis for Tribunal Decision (U/FOUO)
     (2) (U) Classified Summary of Basis for Tribunal Decision (S/NF)
     (3) (U) Summary of Detainee/Witness Testimony (U/FOUO)
     (4) (U) Copies of Documentary Evidence Presented (S/NF)
     (5) (U) Personal Representative's Record Review (U/FOUO)

1. (U) This Tribunal was convened on 12 November 2004 by references (a) and (b) to make a determination as to whether the Detainee meets the criteria to be designated as an enemy combatant, as defined in reference (c).

2. (U) On 12 November 2004 the Tribunal determined, by a preponderance of the evidence, that Detainee #709 is properly designated as an enemy combatant as defined in reference (c).

3. (U) In particular, the Tribunal finds that this Detainee is a member of, or affiliated with al Qaida, the Taliban, and associated forces that are engaged in hostilities against the United States and its coalition partners, as more fully discussed in the enclosures.

4. (U) Enclosure (1) provides an unclassified account of the basis for the Tribunal's decision. A detailed account of the evidence considered by the Tribunal and its findings of fact are contained in enclosures (1) and (2).



Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//~~FOUO~~.

# UNCLASSIFIED SUMMARY OF BASIS FOR TRIBUNAL DECISION

## (Enclosure (1) to Combatant Status Review Tribunal Decision Report)

TRIBUNAL PANEL: _____#12____

ISN #: _____709____

## 1. Introduction

As the Combatant Status Review Tribunal (CSRT) Decision Report indicates, the Tribunal has determined that this Detainee is properly classified as an enemy combatant because he is a member of, or affiliated with al Qaida, the Taliban, and associated forces that are engaged in hostilities against the United States and its coalition partners. In reaching its conclusions, the Tribunal considered both classified and unclassified information. The following is an account of the unclassified evidence considered by the Tribunal and other pertinent information. Classified evidence considered by the Tribunal is discussed in Enclosure (2) to the CSRT Decision Report.

## 2. Synopsis of Proceedings

The unclassified evidence presented to the Tribunal by the Recorder alleged that the Detainee served in the Libyan military from 1983 to 1990, where he received training with AK-47s, pistols, and various machine guns. The Detainee traveled from Libya to Afghanistan via Tanzania, Algeria and France in 1990, to fight the jihad against the Soviet Union. He received weapons training at two Libyan training camps located within Afghanistan. The Detainee stayed at a Libyan Islamic Fighting Group (LIFG) guesthouse in Jalalabad, Afghanistan and was a member of LIFG, a known terrorist organization. The Detainee traveled to Tora Bora in December 2001 and after the fall of the Taliban, he fled to Pakistan where he was captured in a Libyan guesthouse. He requested four witnesses from Libya, requested no documents to be produced and asked that his assigned Personal Representative present a dictated statement on his behalf. The Tribunal President found the requested witnesses not reasonably available. The Detainee, in his unsworn dictated statement, denied participating in any hostilities against the Americans. He was drafted and served in the army and had weapons training, but never used his training in Libya in the Libyan Army to fight against the Americans. He claimed that he did flee his country of Libya in 1990 to immigrate to Afghanistan to start a new life. The Detainee acknowledged that he did receive training at two Libyan training camps in Afghanistan but was just following the crowd. He admitted staying at a Libyan Islamic Fighting Group (LIFG) guesthouse in Jalalabad, but indicated that it was before September 11, 2001 and said that he had nowhere else to go. The Detainee denied ever being a member of LIFG, but was compelled to stay with them and had no choice but to stay. He did not know that LIFG was a terrorist organization and he especially did not endorse the September 11th attacks. The Detainee denied ever being at Tora Bora but

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

admitted being in Pakistan in December 2001. He explained that he did flee after the fall of the Taliban but his capture was at a Pakistani man's house, not a Libyan guesthouse.

The Tribunal President's evidentiary and witness rulings are explained below.

## 3. Evidence Considered by the Tribunal

The Tribunal considered the following evidence in reaching its conclusions:

    a. Exhibits: D-a and R-1 through R-17.

    b. Testimony of the following persons: Unsworn dictated statement presented by the Personal Representative on behalf of the Detainee.

## 4. Rulings by the Tribunal on Detainee Requests for Evidence or Witnesses

The Detainee requested the following witnesses be produced for the hearing:

| Witness | President's Decision | Testified? |
| --- | --- | --- |
| | not reasonably available* | no |
| (alias: ) | not reasonably available* | no |
| | not reasonably available* | no |
| | not reasonably available* | no |

* All of the requested witnesses apparently live or are incarcerated in Libya. On 1 November 2004, the U.S. Department of State liaison officer replied to the request for assistance by asserting that the United States does not have diplomatic relations with Libya and therefore does not have means to communicate this request to its government (Supplemental Exhibit 1)(Note: according to the State Department's website, U.S. diplomatic personnel reopened the U.S. Interests Section in Tripoli on February 8, 2004, and the mission was upgraded to a U.S. liaison office on June 28, 2004. Libya reestablished its diplomatic presence in Washington with the opening of an Interests Section on July 8, 2004. See http://www.state.gov/r/pa/ei/bgn/5425.htm, Background Note – Libya, page 8 of 9, updated October 2004)(Supplemental Exhibit 2). No further effort was apparently expended to locate the witnesses for reasons that are not apparent to the Tribunal. The Tribunal President was therefore constrained to determine the witnesses to be not reasonably available.

The Detainee requested no additional evidence be produced.

## 5. Discussion of Unclassified Evidence

The Tribunal considered the following unclassified evidence in making its determinations:

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

a. The Recorder offered Exhibits R-1 and R-2 into evidence during the unclassified portion of the proceeding. Exhibit R-1 is the Unclassified Summary of Evidence. While this summary is helpful in that it provides a broad outline of what the Tribunal can expect to see, it is not persuasive in that it provides conclusory statements without supporting unclassified evidence. Exhibit R-2 provided no usable evidence. Accordingly, the Tribunal had to look to classified exhibits for support of the Unclassified Summary of Evidence.

b. Essentially, the only unclassified evidence the Tribunal had to consider was the Detainee's unsworn dictated statement as provided by the Personal Representative. A summarized transcript of the Detainee's unsworn dictated statement is attached as CSRT Decision Report Enclosure (3). In sum, the Detainee denied participating in any hostilities against the Americans. He was drafted and served in the army and had weapons training, but never used his training in Libya in the Libyan Army to fight against the Americans. He claimed that he did flee his country of Libya in 1990 to go to Afghanistan for immigration to start a new life. The Detainee acknowledged that he did receive training at two Libyan training camps in Afghanistan but was just following the crowd. He admitted staying at a Libyan Islamic Fighting Group (LIFG) guesthouse in Jalalabad, but indicated that it was before September 11, 2001 and said that he had nowhere else to go. The Detainee denied ever being a member of LIFG, but was compelled to stay with them and had no choice but to stay. He did not know that LIFG was a terrorist organization and he especially did not endorse the September 11th attacks. The Detainee denied ever being at Tora Bora but admitted being in Pakistan in December 2001. He explained that he did flee after the fall of the Taliban but his capture was at a Pakistani man's house, not a Libyan guesthouse.

The Tribunal also relied on certain classified evidence in reaching its decision. A discussion of the classified evidence is found in Enclosure (2) to the Combatant Status Review Tribunal Decision Report.

**6. Consultations with the CSRT Legal Advisor**

No issues arose during the course of this hearing that required consultation with the CSRT legal advisor.

**7. Conclusions of the Tribunal**

Upon careful review of all the evidence presented in this matter, the Tribunal makes the following determinations:

a. The Detainee was mentally and physically capable of participating in the proceeding. No medical or mental health evaluation was requested or deemed necessary (although the Tribunal does recommend continued vigilance of this Detainee's mental

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

condition due to a past history of psychosis and lingering breathing difficulties because of a serious car accident in 1985 [Exhibit R-17]).

b. The Detainee chose not to participate in the Tribunal process, as indicated in Exhibit D-a. Although he did not actively participate, there was no reason to believe he did not understand the Tribunal process.

c. The Detainee is properly classified as an enemy combatant because he is a member of, or affiliated with al Qaida, the Taliban, and associated forces that are engaged in hostilities against the United States and its coalition partners.

**8. Dissenting Tribunal Member's report**

None. The Tribunal reached a unanimous decision.

Respectfully submitted,



Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//~~FOUO~~

**Summarized Unsworn Detainee Statement**

*The Personal Representative made the following submission on behalf of the Detainee, who was not present during the proceedings.*

- **3(a)1   The detainee served in the Libyan military from 1983 to 1990, where he received training with AK-47's, pistols and various machine guns.**

  I did not participate in any hostilities against the Americans. My job... I was drafted; they drafted me. I served in the Army and I trained on an AK-47 and a pistol, but did not train on a machine gun. I never used any of my training from the Libyan Army to fight against the Americans.

- **3(a)2   The detainee traveled from Libya to Afghanistan via Tanzania, Algeria and France in 1990, to fight the jihad against the Soviet Union.**

  I did not go through Tanzania; there were no Russians there at that time. I fled my country, Libya, in 1990 to go to Afghanistan to immigrate and to start a new life.

- **3(a)3   The detainee received weapons training (AD-47, sniper rifle, RPGs, and 82mm mortars) at two Libyan training camps located within Afghanistan ▮▮▮▮▮ and ▮▮▮▮▮▮▮.**

  I received training, but not on the RPG. I followed the crowd. They said "Come with us." In 1993 the Russians went. There was a new Afghanistan communist government in charge before the Taliban. During this time, I traveled back and forth between Pakistan and Afghanistan.

- **3(a)4   The detainee stayed at a Libyan Islamic Fighting Group (LIFG) guesthouse in Jalalabad City, AF.**

  Yes, I did before, not after, September 11th. I was in Kabul, Afghanistan before September 11th around the year 2000. I had nowhere else to go.

- **3(a)5   The detainee was a member of the LIFG.**

  I was never a member. I was compelled to stay with them; I had no choice but to stay.

UNCLASSIFIED//~~FOUO~~

- **3(a)6   LIFG is a known terrorist organization.**

  I never knew that. From what I know, it was not terrorism. I especially did not endorse the September 11th attack. That organization did not commit terrorism anywhere.

- **3(a)7   Detainee traveled to Tora Bora in December 2001.**

  I never went to Tora Bora in December 2001. I was in Pakistan in December 2001.

- **3(a)8   After the fall of the Taliban, the detainee fled to Pakistan where he was captured in a Libyan guesthouse.**

  I fled after the fall of the Taliban at Lahore. I was not captured at a Libyan guesthouse; it was at a Pakistani man's house.

## AUTHENTICATION

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the proceedings.

Colonel, U.S. Marine Corps
Tribunal President

UNCLASSIFIED//~~FOUO~~

# DETAINEE ELECTION FORM

**Date:** 27-Oct-04

**Start Time:** 1530

**End Time:** 1615

**ISN#:** 709

**Personal Representative:** ███████████
**(Name/Rank)**

**Translator Required?** YES          **Language?**          ARABIC

**CSRT Procedure Read to Detainee or Written Copy Read by Detainee?** YES

------------------------------------------------------------------------

## Detainee Election:

[ ] **Wants to Participate in Tribunal**

[X] **Affirmatively Declines to Participate in Tribunal**

[ ] **Uncooperative or Unresponsive**

## Personal Representative Comments:

Detainee has elected NOT to Attend/Participate the Tribunals but has requested that his PR present a dictated statement on his behalf. He has 4 witness requests:

#1. ████ from ████████ (last name unknown) ████ is currently in the Abu Salim Jail in Traplios Libya. The Libyan GVT Delegation that visited ISN-709 told him that ████ was in ~~that prison. ████ can testify that the detainee was with him in PK in DEC, 2001 not in Tora~~ Bora as accused and he can also testify that he was not ever a member of the LIFG as accused.

Detainee now has 3 additional witness requests.
#2. ██████ (alias: ████████) is also located in the Abu Salim Jail in Traplios Lybia. He can ~~testify that the detainee was not a member of the LIFG.~~
#3. ██████████ is from the city of Zawia and
#4. ██████████ is from the city of Musalata.

Witnesses 1-2&3 all can testify that he was not a member of the LIFG

**Personal Representative:** ████████████████

Exhibit  D-A

UNCLASSIFIED

## Combatant Status Review Board

TO: Personal Representative

FROM: OIC, CSRT (08 October 2004)

Subject: Summary of Evidence for Combatant Status Review Tribunal – ABU AL QUISIN, Abdul Rauf Omar Mohammed.

1. Under the provisions of the Secretary of the Navy Memorandum, dated 29 July 2004, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at Guantanamo Bay Naval Base Cuba*, a Tribunal has been appointed to review the detainee's designation as an enemy combatant.

2. An enemy combatant has been defined as "an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."

3. The United States Government has previously determined that the detainee is an enemy combatant. This determination is based on information possessed by the United States that indicates that he is associated with forces engaged in hostilities against the United States or its coalition partners.

The detainee is associated with forces engaged in hostilities against the United States or its coalition partners:

   1. The detainee served in the Libyan military from 1983 to 1990, where he received training with AK-47s, pistols and various machine guns.

   2. The detainee traveled from Libya to Afghanistan via Tanzania, Algeria and France in 1990, to fight the jihad against the Soviet Union.

   3. The detainee received weapons training (AK-47, sniper rifle, RPGs, and 82mm mortars) at two Libyan training camps located within Afghanistan ▉▉▉▉▉ and ▉▉▉▉.

   4. The detainee stayed at a Libyan Islamic Fighting Group (LIFG) guesthouse in Jalalabad City, AF.

   5. The detainee was a member of the LIFG.

   6. LIFG is a known terrorist organization.

   7. Detainee traveled to Tora Bora in December 2001.

   8. After the fall of the Taliban, the detainee fled to Pakistan where he was captured in a Libyan guesthouse.

UNCLASSIFIED

Exhibit __R1__

UNCLASSIFIED

4. The detainee has the opportunity to contest his designation as an enemy combatant. The Tribunal will endeavor to arrange for the presence of any reasonably available witnesses or evidence that the detainee desires to call or introduce to prove that he is not an enemy combatant. The Tribunal President will determine the reasonable availability of evidence or witnesses.

UNCLASSIFIED

## Memorandum



| | | | |
|---|---|---|---|
| To : | Department of Defense<br>Office of Administrative Review<br>for Detained Enemy Combatants,<br>Col. David Taylor, OIC, CSRT | Date | 09/17/2004 |

From : FBI GTMO
Counterterrorism Division,
Office of General Counsel,
Asst. Gen. Counsel ███████

Subject: REQUEST FOR REDACTION OF
NATIONAL SECURITY INFORMATION
ISN ███████████

     Pursuant to the Secretary of the Navy Order of 29
July 2004, Implementation of Combatant Review Tribunal
Procedures for Enemy Combatants Detained at Guantanamo Bay
Naval Base, Cuba, Section D, paragraph 2, the FBI requests
redaction of the information herein marked[1].  The FBI makes
this request on the basis that said information relates to the
national security of the United States[2].  Inappropriate
dissemination of said information could damage the national
security of the United States and compromise ongoing FBI
investigations.

CERTIFICATION THAT REDACTED INFORMATION DOES NOT SUPPORT A
DETERMINATION THAT THE DETAINEE IS NOT AN ENEMY COMBATANT

    The FBI certifies the aforementioned redaction
contains no information that would support a determination
that the detainee is not an enemy combatant.

    The following documents relative to ISN 709 have
been redacted by the FBI and provided to the OARDEC, GTMO:

FD-302 dated 08/11/2002

---

   [1]Redactions are blackened out on the OARDEC provided FBI
document.

   [2]See Executive Order 12958

pg 1 of 2

Exhibit ___ R2

UNCLASSIFIED

Memorandum from ████████ to Col. David Taylor
Re:  REQUEST FOR REDACTION, 09/17/2004


If you need additional assistance, please contact Assistant
General Counsel ███████ (██████████),
████████████████████████ or Intelligence Analyst ████

-2-

pg 2 of 2

DoS witness request response.709.11.01.04.txt

Detainee is a member of, or affiliated with al Qaida, the Taliban, and associated forces that are engaged in hostilities against the United States and its coalition partnersFrom: ██████████████ CIV (H)
Sent: Monday, November 01, 2004 3:13 PM
To: ██████
Cc: ███████████ CPT (H); crisfield; ████████████████ CAPT (H)
Subject: RE: New Witness Request

Classification: U N C L A S S I F I E D
Caveats: ~~FOUO~~

Thanks, I'll pass the response along.

R/██████

-----Original Message-----
From: █████████████ [mailto:████████████████
Sent: Monday, November 01, 2004 3:10 PM
To: '███████████ CIV (H)'
Subject: RE: New Witness Request

This one is a problem - we do not have diplomatic relations with Libya and do not have means to communicate this request to government.

-----Original Message-----
From: ████████████ CIV (H) [mailto:████████████████████
Sent: Monday, November 01, 2004 3:10 PM
To: LTC ████
Cc: ███████████ CPT (H); crisfield; █████████████ CAPT (H)
Subject: New Witness Request

Classification: U N C L A S S I F I E D
Caveats: ~~FOUO~~

LTC ██████,

please find attached, a new witness request regarding the CSRT.

VR/██████

  <<709.CITF Witness Request Template.11.01.04.doc>>
      Attachment Classification: U N C L A S S I F I E D
      Attachment Caveats: ~~FOUO~~

Classification: U N C L A S S I F I E D
Caveats: ~~FOUO~~

Classification: U N C L A S S I F I E D
Caveats: ~~FOUO~~

Home | Contact Us | Email this Page | FOIA | Privacy Notice | Archive | Español    Search

# U.S. DEPARTMENT *of* STATE

About the State Dept. | Press and Public Affairs | Travel and Living Abroad | Countries and Regions | International Issues | History, Education and Culture | Business Center | Other Services

[Print Friendly Version]

**Bureau of Near Eastern Affairs**
**October 2004**

People

History

Government

Political Conditions

Economy

Foreign Relations

U.S. Relations

Travel/Business

Background Notes A-Z



## Background Note: Libya



## PROFILE

**OFFICIAL NAME:**
Great Socialist People's Libyan Arab Jamahiriya

**Geography**
Area: 1,759,540 million sq. km.
Cities: *Capital*--Tripoli (2002 pop est. 1,223,300). *Other*--Benghazi (2002 pop est. 1,080,500).
Terrain: Mostly barren, flat to undulating plains, plateaus, depressions.
Climate: Mediterranean along coast; dry, extreme desert interior.

**People**
Nationality: *Noun and adjective*--Libyan(s).
Population (July 2004 est.): 5,631,585 (includes non-nationals, of which an estimated 500,000 or more are sub-Saharan Africans living in Libya).
Annual growth rate (2004 est.): 2.37%.
Ethnic groups: Berber and Arab 97%; Greeks, Maltese, Italians, Egyptians, Pakistanis, Turks, Indians, and Tunisians.
Religion: Sunni Muslim 97%.
Languages: Arabic, Italian, English, all are widely understood in major cities.
Education: *Years compulsory*--9. *Attendance*--90%. *Literacy*--82.6%.
Health (2004 est.): *Infant mortality rate*--25.7/1,000. *Life expectancy*--male, 74.1 yrs.; female, 78.58 yrs.
Work force (2001 est.): 1.6 million, an estimated 500,000 of whom are sub-Saharan African foreign workers. Work force by occupation (1997 est.): *Industry*--29%. *Services and Government*--54%. *Agriculture*--17%.

**Government**
Official name: Great Socialist People's Libyan Arab Jamahiriya.
Type: "Jamahiriya" is a term Col. Mu'ammar al-Qadhafi coined and which he defines as a "state of the masses" governed by the populace through local councils. In fact, the Libyan state is a military dictatorship.
Independence: December 24, 1951. Revolution: September 1, 1969.
Constitution: December 11, 1969, amended March 2, 1977--established popular congresses and people's committees.
Administrative divisions: 25 municipalities (singular--"baladiyah", plural--"baladiyat"): Ajdabiya, Al'Aziziyah, Al'Fatih, Al Jabal al-Akhdar, Al Jufrah, Al Khums, Al Kufrah, An Nuqat al Khams, Ash Shati', Awbari, Az Zawiyyah,

Benghazi, Darnah, Ghadamis, Gharyan, Misratah, Murzuq, Sabha, Sawfajjin, Surt, Tarabulus, Tarhunah, Tubruq, Yafran, Zlitan.
Political system: Political parties are banned. According to the political theory of Col. Mu'ammar al-Qadhafi, multi-layered popular assemblies (people's congresses) with executive institutions (people's committees) are guided by political cadres (revolutionary committees).
Suffrage: 18 years of age; universal and compulsory.

## Economy
GDP (2003 est.): $35 billion.
Per capita GDP (2003 est.): $6,400.
Natural resources: Petroleum, natural gas, gypsum.
Agriculture: *Products*–wheat, barley, olives, dates, citrus, vegetables, peanuts, soybeans; cattle; approximately 75% of Libya's food is imported.
Industry: *Types*–petroleum, food processing, textiles, handicrafts, cement.
Trade: *Exports* (2003 est.)–$14.32 billion: crude oil, refined petroleum products. *Major markets* (2003)–Italy (39.4%),Germany (13.6%), Spain (13.6%), Turkey 6.6%, France (6.2%). *Imports* (2003 est.)–$6.282 billion: machinery, transport equipment, food, manufactured goods. *Major suppliers* (2003)–Italy (27.2%), Germany (10.3%), Tunisia (7.7%), U.K. (6.9%), South Korea (6.9%), France (5.8%).

## PEOPLE
Libya has a small population in a large land area. Population density is about 50 persons per sq. km. (80/sq. mi.) in the two northern regions of Tripolitania and Cyrenaica, but falls to less than one person per sq. km. (1.6/sq. mi.) elsewhere. Ninety percent of the people live in less than 10% of the area, primarily along the coast. More than half the population is urban, mostly concentrated in the two largest cities, Tripoli and Benghazi. Fifty percent of the population is estimated to be under age 15.

Native Libyans are primarily a mixture of Arabs and Berbers. Small Tebou and Touareg tribal groups in southern Libya are nomadic or semi-nomadic. Among foreign residents, the largest groups are citizens of other African nations, including North Africans (primarily Egyptians and Tunisians), West Africans and Sub-Saharan Africans.

## HISTORY
For most of their history, the peoples of Libya have been subjected to varying degrees of foreign control. The Phoenicians, Carthaginians, Greeks, Romans, Vandals, and Byzantines ruled all or parts of Libya. Although the Greeks and Romans left impressive ruins at Cyrene, Leptis Magna, and Sabratha, little else remains today to testify to the presence of these ancient cultures.

The Arabs conquered Libya in the seventh century A.D. In the following centuries, most of the indigenous peoples adopted Islam and the Arabic language and culture. The Ottoman Turks conquered the country in the mid-16th century. Libya remained part of their empire--although at times virtually autonomous--until Italy invaded in 1911 and, in the face of years of resistance, made Libya a colony.

In 1934, Italy adopted the name "Libya" (used by the Greeks for all of North Africa, except Egypt) as the official name of the colony, which consisted of the Provinces of Cyrenaica, Tripolitania, and Fezzan. King Idris I, Emir of Cyrenaica, led Libyan resistance to Italian occupation between the two World Wars. From 1943 to 1951, Tripolitania and Cyrenaica were under British administration, while the French controlled Fezzan. In 1944, Idris returned from exile in Cairo but declined to resume permanent residence in Cyrenaica until the removal in 1947 of some aspects of foreign control. Under the terms of the 1947 peace treaty with the Allies, Italy relinquished all claims to Libya.

On November 21, 1949, the UN General Assembly passed a resolution stating that Libya should become independent before January 1, 1952. King Idris I represented Libya in the subsequent UN negotiations. When Libya declared its independence on December 24, 1951, it was the first country to achieve

independence through the United Nations and one of the first former European possessions in Africa to gain independence. Libya was proclaimed a constitutional and a hereditary monarchy under King Idris.

The discovery of significant oil reserves in 1959 and the subsequent income from petroleum sales enabled what had been one of the world's poorest countries to become extremely wealthy, as measured by per capita GDP. Although oil drastically improved Libya's finances, popular resentment grew as wealth was increasingly concentrated in the hands of the elite. This discontent continued to mount with the rise throughout the Arab world of Nasserism and the idea of Arab unity.

On September 1, 1969, a small group of military officers led by then 28-year-old army officer Mu'ammar Abu Minyar al-Qadhafi staged a coup d'etat against King Idris, who was exiled to Egypt. The new regime, headed by the Revolutionary Command Council (RCC), abolished the monarchy and proclaimed the new Libyan Arab Republic. Qadhafi emerged as leader of the RCC and eventually as de facto chief of state, a political role he still plays. The Libyan government asserts that Qadhafi currently holds no official position, although he is referred to in government statements and the official press as the "Brother Leader and Guide of the Revolution."

The new RCC's motto became "freedom, socialism, and unity." It pledged itself to remedy "backwardness", take an active role in the Palestinian Arab cause, promote Arab unity, and encourage domestic policies based on social justice, non-exploitation, and an equitable distribution of wealth.

An early objective of the new government was withdrawal of all foreign military installations from Libya. Following negotiations, British military installations at Tobruk and nearby El Adem were closed in March 1970, and U.S. facilities at Wheelus Air Force Base near Tripoli were closed in June 1970. That July, the Libyan Government ordered the expulsion of several thousand Italian residents. By 1971, libraries and cultural centers operated by foreign governments were ordered closed.

In the 1970s, Libya claimed leadership of Arab and African revolutionary forces and sought active roles in international organizations. Late in the 1970s, Libyan embassies were redesignated as "people's bureaus," as Qadhafi sought to portray Libyan foreign policy as an expression of the popular will. The people's bureaus, aided by Libyan religious, political, educational, and business institutions overseas, exported Qadhafi's revolutionary philosophy abroad.

Qadhafi's confrontational foreign policies and use of terrorism, as well as Libya's growing friendship with the U.S.S.R., led to increased tensions with the West in the 1980s. Following a terrorist bombing at a discotheque in West Berlin frequented by American military personnel, in 1986 the U.S. retaliated militarily against targets in Libya, and imposed broad unilateral economic sanctions.

After Libya was implicated in the 1988 bombing of Pan Am flight 103 over Lockerbie, Scotland, UN sanctions were imposed in 1992. UN Security Council resolutions (UNSCRs) passed in 1992 and 1993 obliged Libya to fulfill requirements related to the Pan Am 103 bombing before sanctions could be lifted. Qadhafi initially refused to comply with these requirements, leading to Libya's political and economic isolation for most of the 1990s.

In 1999, Libya fulfilled one of the UNSCR requirements by surrendering two Libyans suspected in connection with the bombing for trial before a Scottish court in the Netherlands. One of these suspects, Abdel Basset al-Megrahi, was found guilty; the other was acquitted. Al-Megrahi's conviction was upheld on appeal in 2002. In August 2003, Libya fulfilled the remaining UNSCR requirements, including acceptance of responsibility for the actions of its officials and payment of appropriate compensation to the victims' families. UN sanctions were lifted on September 12, 2003.

On December 19, 2003, Libya announced its intention to rid itself of WMD and MTCR-class missile programs. Since that time, it has cooperated with the U.S., the U.K., the International Atomic Energy Agency, and the Organization for the Prohibition of Chemical Weapons toward these objectives. Libya has also signed the IAEA Additional Protocol and has become a State Party to the Chemical Weapons Convention.

## GOVERNMENT AND POLITICAL CONDITIONS

Libya's political system is theoretically based on the political philosophy in Qadhafi's Green Book, which combines socialist and Islamic theories and rejects parliamentary democracy and political parties. In reality, Qadhafi exercises near total control over the government. For the first seven years following the revolution, Colonel Qadhafi and 12 fellow army officers, the Revolutionary Command Council, began a complete overhaul of Libya's political system, society and economy. In 1973, he announced the start of a "cultural revolution" in schools, businesses, industries, and public institutions to oversee administration of those organizations in the public interest. On March 3, 1977, Qadhafi convened a General People's Congress (GPC) to proclaim the establishment of "people's power," change the country's name to the Socialist People's Libyan Arab Jamahiriya, and to vest, theoretically, primary authority in the GPC.

The GPC is the legislative forum that interacts with the General People's Committee, whose members are secretaries of Libyan ministries. It serves as the intermediary between the masses and the leadership and is composed of the secretariats of some 600 local "basic popular congresses." The GPC secretariat and the cabinet secretaries are appointed by the GPC secretary general and confirmed by the annual GPC congress. These cabinet secretaries are responsible for the routine operation of their ministries, but Qadhafi exercises real authority directly or through manipulation of the peoples and revolutionary committees.

Qadhafi remained the de facto chief of state and secretary general of the GPC until 1980, when he gave up his office. Although he holds no formal office, Qadhafi exercises absolute power with the assistance of a small group of trusted advisers, who include relatives from his home base in the Sirte region, which lies between the rival provinces of Tripolitania and Cyrenaica.

In the 1980s, competition grew between the official Libyan Government and military hierarchies and the revolutionary committees. An abortive coup attempt in May 1984, apparently mounted by Libyan exiles with internal support, led to a short-lived reign of terror in which thousands were imprisoned and interrogated. An unknown number were executed. Qadhafi used the revolutionary committees to search out alleged internal opponents following the coup attempt, thereby accelerating the rise of more radical elements inside the Libyan power hierarchy.

In 1988, faced with rising public dissatisfaction with shortages in consumer goods and setbacks in Libya's war with Chad, Qadhafi began to curb the power of the revolutionary committees and to institute some domestic reforms. The regime released many political prisoners and eased restrictions on foreign travel by Libyans. Private businesses were again permitted to operate.

In the late 1980s, Qadhafi began to pursue an anti-Islamic fundamentalist policy domestically, viewing fundamentalism as a potential rallying point for opponents of the regime. Qadhafi's security forces launched a pre-emptive strike at alleged coup plotters in the military and among the Warfallah tribe in October 1993. Widespread arrests and government reshufflings followed, accompanied by public "confessions" from regime opponents and allegations of torture and executions. The military, once Qadhafi's strongest supporters, became a potential threat in the 1990s. In 1993, following a failed coup attempt that implicated senior military officers, Qadhafi began to purge the military periodically, eliminating potential rivals and inserting his own loyal followers in their place.

The Libyan court system consists of three levels: the courts of first instance; the courts of appeals, and the Supreme Court, which is the final appellate level. The

GPC appoints justices to the Supreme Court. Special "revolutionary courts" and military courts operate outside the court system to try political offenses and crimes against the state. Libya's justice system is nominally based on Sharia law.

**Principal Government Officials**
De facto Head of State--Mu'ammar Abu Minyar al-Qadhafi ("the Brotherly Leader and Guide of the Revolution.")
Secretary General of the General People's Committee (Prime Minister)--Shukri Ghanem
Secretary of the General People's Committee for Foreign Liaison and International Cooperation (Foreign Minister)--Abd al-Rahman Shalgham
Chief of Mission, Libyan Interests Section--Ali Aujali

The Libyan Interests Section is temporarily located at the Marriott Wardman Park Hotel, Suite 6348, 2660 Woodley Park Road NW, Washington DC 20008 (tel. 202-328-2000, fax 202-745-2190).

**ECONOMY**
The government dominates Libya's socialist-oriented economy through complete control of the country's oil resources, which account for approximately 95% of export earnings, 75% of government receipts, and 30% of the gross domestic product. Oil revenues constitute the principal source of foreign exchange. Much of the country's income has been lost to waste, corruption, conventional armaments purchases, and attempts to develop weapons of mass destruction, as well as to large donations made to developing countries in attempts to increase Qadhafi's influence in Africa and elsewhere. Although oil revenues and a small population give Libya one of the highest per capita GDPs in Africa, the government's mismanagement of the economy has led to high inflation and increased import prices, resulting in a decline in the standard of living.

Despite efforts to diversify the economy and encourage private sector participation, extensive controls of prices, credit, trade, and foreign exchange constrain growth. Import restrictions and inefficient resource allocations have caused periodic shortages of basic goods and foodstuffs.

Although agriculture is the second-largest sector in the economy, Libya imports most foods. Climatic conditions and poor soils severely limit output, while higher incomes and a growing population have caused food consumption to rise. Domestic food production meets about 25% of demand.

On September 20, 2004, President George W. Bush signed an Executive Order ending economic sanctions imposed under the authority of the International Emergency Economic Powers Act (IEEPA). U.S. persons are no longer prohibited from working in Libya, and many American companies are actively seeking investment opportunities in Libya. The government has announced ambitious plans to increase foreign investment in the oil and gas sectors to significantly boost production capacity. The government is also pursuing a number of infrastructure projects such as highways, railways, telecommunications backbones, and irrigation.

**FOREIGN RELATIONS**
Since 1969, Qadhafi has determined Libya's foreign policy. His principal foreign policy goals have been Arab unity, elimination of Israel, advancement of Islam, support for Palestinians, elimination of outside--particularly Western--influence in the Middle East and Africa, and support for a range of "revolutionary" causes.

After the 1969 coup, Qadhafi closed American and British bases on Libyan territory and partially nationalized all foreign oil and commercial interests in Libya. He also played a key role in promoting the use of oil embargoes as a political weapon for challenging the West, hoping that an oil price rise and embargo in 1973 would persuade the West--especially the United States--to end support for Israel. Qadhafi rejected both Soviet communism and Western capitalism, and claimed he was charting a middle course.

Libya's relationship with the former Soviet Union involved massive Libyan arms purchases from the Soviet bloc and the presence of thousands of east bloc advisers. Libya's use–and heavy loss–of Soviet-supplied weaponry in its war with Chad was a notable breach of an apparent Soviet-Libyan understanding not to use the weapons for activities inconsistent with Soviet objectives. As a result, Soviet-Libyan relations reached a nadir in mid-1987.

After the fall of the Warsaw Pact and the Soviet Union, Libya concentrated on expanding diplomatic ties with Third World countries and increasing its commercial links with Europe and East Asia. Following the imposition of UN sanctions in 1992, these ties significantly diminished. Following a 1998 Arab League meeting in which fellow Arab states decided not to challenge UN sanctions, Qadhafi announced that he was turning his back on pan-Arab ideas, one of the fundamental tenets of his philosophy.

Instead, Libya pursued closer bilateral ties, particularly with North African neighbors Egypt, Tunisia, and Morocco. It has also sought to develop its relations with Sub-Saharan Africa, leading to Libyan involvement in several internal African disputes in the Democratic Republic of Congo, Sudan, Somalia, Central African Republic, Eritrea and Ethiopia. Libya has also sought to expand its influence in Africa through financial assistance, ranging from aid donations to impoverished neighbors such as Niger to oil subsidies to Zimbabwe, and through participation in the African Union. Qadhafi has proposed a borderless "United States of Africa" to transform the continent into a single nation-state ruled by a single government. This plan has been greeted with skepticism. Libya has played a helpful role in facilitating the provision of humanitarian assistance to Darfur refugees in Chad.

### Terrorism

Libya has taken significant steps to mend its international image and renounced terrorism in a letter to the UN Security Council in August 2003. In 1999, the Libyan government surrendered two Libyans suspected of involvement in the Pan Am 103 bombing, leading to the suspension of UN sanctions. On January 31, 2001, a Scottish court seated in the Netherlands found one of the suspects, Abdel Basset al-Megrahi, guilty of murder in connection with the bombing, and acquitted the second suspect, Al-Amin Khalifa Fhima. Megrahi's conviction was upheld on March 14, 2002.

UN sanctions were lifted on September 12, 2003 following Libyan compliance with its remaining UNSCR requirements on Pan Am 103, including acceptance of responsibility for the actions of its officials and payment of appropriate compensation. Libya paid compensation in 1999 for the death of British policewoman Yvonne Fletcher, a move that preceded the reopening of the British Embassy in Tripoli, and paid damages to the families of the victims in the bombing of UTA Flight 772. With the lifting of UN sanctions in September 2003, the families of the victims of Pan Am 103 received $4 million of a maximum $10 million in compensation. After the lifting of IEEPA-based sanctions on September 20, 2004, the families will receive a further $4 million. A final payment of $2 million per family is tied to Libya's removal from the state sponsors of terrorism list.

On November 13, 2001, a German court found four persons, including a former employee of the Libyan embassy in East Berlin, guilty in connection with the 1986 La Belle disco bombing, in which two U.S. servicemen were killed. The court also established a connection to the Libyan government. The German government has demanded that Libya accept responsibility for the La Belle bombing and pay appropriate compensation. A compensation deal for non-U.S. victims was agreed in August 2004. U.S. victims continue to pursue their claims in federal court.

By 2003, Libya appeared to have curtailed its support for international terrorism, although it may have retained residual contacts with some of its former terrorist clients. In August 2004, the Department of Justice entered into a plea agreement with Abdulrahman Alamoudi, in which he stated that he had been part of a 2003 plot to assassinate Saudi Crown Prince Abdallah at the behest of Libyan government officials. The U.S. takes these charges very seriously. Libya's record of support for terrorism remains under review.

## U.S.-LIBYAN RELATIONS

The United States supported the UN resolution providing for Libyan independence in 1951 and raised the status of its office at Tripoli from a consulate general to a legation. Libya opened a legation in Washington, DC, in 1954. Both countries subsequently raised their missions to embassy level.

After Qadhafi's 1969 coup, U.S.-Libyan relations became increasingly strained because of Libya's foreign policies supporting international terrorism and subversion against moderate Arab and African governments. In 1972, the United States withdrew its ambassador. Export controls on military equipment and civil aircraft were imposed during the 1970s, and U.S. embassy staff members were withdrawn from Tripoli after a mob attacked and set fire to the embassy in December 1979. The U.S. Government declared Libya a "state sponsor of terrorism" on December 29, 1979.

In May 1981, the U.S. Government closed the Libyan "people's bureau" (embassy) in Washington, DC, and expelled the Libyan staff in response to a general pattern of conduct by the people's bureau contrary to internationally accepted standards of diplomatic behavior.

In August 1981, two Libyan jets fired on U.S. aircraft participating in a routine naval exercise over international waters of the Mediterranean claimed by Libya. The U.S. planes returned fire and shot down the attacking Libyan aircraft. In December 1981, the State Department invalidated U.S. passports for travel to Libya and, for purposes of safety, advised all U.S. citizens in Libya to leave. In March 1982, the U.S. Government prohibited imports of Libyan crude oil into the United States and expanded the controls on U.S.-origin goods intended for export to Libya. Licenses were required for all transactions, except food and medicine. In March 1984, U.S. export controls were expanded to prohibit future exports to the Ras al-Enf petrochemical complex. In April 1985, all Export-Import Bank financing was prohibited.

Due to Libya's continuing support for terrorism, the United States adopted additional economic sanctions against Libya in January 1986, including a total ban on direct import and export trade, commercial contracts, and travel-related activities. In addition, Libyan Government assets in the United States were frozen. When evidence of Libyan complicity was discovered in the Berlin discotheque terrorist bombing that killed an American serviceman, the United States responded by launching an aerial bombing attack against targets near Tripoli and Benghazi in April 1986. Subsequently, the United States maintained its trade and travel embargoes and brought diplomatic and economic pressure to bear against Libya. This pressure helped to bring about the Lockerbie settlement and Libya's renunciation of WMD and MTCR-class missiles.

In 1991, two Libyan intelligence agents were indicted by federal prosecutors in the U.S. and Scotland for their involvement in the December 1988 bombing of Pan Am flight 103. In January 1992, the UN Security Council approved Resolution 731 demanding that Libya surrender the suspects, cooperate with the Pan Am 103 and UTA 772 investigations, pay compensation to the victims' families, and cease all support for terrorism. Libya's refusal to comply led to the approval of UNSC Resolution 748 on March 31, 1992, imposing sanctions designed to bring about Libyan compliance. Continued Libyan defiance led to passage of UNSC Resolution 883—a limited assets freeze and an embargo on selected oil equipment—in November 1993. As noted in the terrorism section above, UN sanctions were lifted on September 12, 2003, after Libya fulfilled all remaining UNSCR requirements, including renunciation of terrorism, acceptance of responsibility for the actions of its officials, and payment of appropriate compensation to the victims' families.

On December 19, 2003, Libya announced its intention to rid itself of WMD and MTCR-class missile programs. Since that time, it has cooperated with the U.S., the U.K., the International Atomic Energy Agency, and the Organization for the Prohibition of Chemical Weapons toward these objectives. Libya has also signed the IAEA Additional Protocol and has become a State Party to the Chemical Weapons Convention. In response, the U.S. has terminated the applicability of the

Iran-Libya Sanctions Act to Libya and the President signed an Executive Order on September 20, 2004 terminating the national emergency with respect to Libya and ending IEEPA-based economic sanctions. This action had the effect of unblocking assets blocked under the Executive Order sanctions. Restrictions on cargo aviation and third-party code-sharing have been lifted, as have restrictions on passenger aviation. Certain export controls also remain in place and Libya remains on the state sponsors of terrorism list. U.S. diplomatic personnel reopened the U.S. Interest Section in Tripoli on February 8, 2004. The mission was upgraded to a U.S. Liaison Office on June 28, 2004. Libya re-established its diplomatic presence in Washington with the opening of an Interest Section on July 8, 2004.

## Principal U.S. Officials
Principal Officer--Greg Berry
Deputy Principal Officer--Leslie Tsou

The U.S. Liaison Office in Libya is temporarily located at the Corinthia Bab Africa Hotel, Souk al-Thulatha, Al-Gadim, Tripoli, Libya (tel. 218-21-335-1845, fax 218-21-335-1838).

The U.S. consular representative's office is located in the Belgian Embassy at the Dhat al-Emad Towers Complex, Tower 4, Fifth Floor, Tripoli, Libya (tel. 218-21-335-0115 / 218-21-335-0116 / 218-21-335-0936, fax 218-21-335-0118, email Tripoli@diplobel.org). Limited services are available for U.S. citizens.

## TRAVEL AND BUSINESS INFORMATION
The U.S. Department of State's Consular Information Program provides Consular Information Sheets, Travel Warnings, and Public Announcements. **Consular Information Sheets** exist for all countries and include information on entry requirements, currency regulations, health conditions, areas of instability, crime and security, political disturbances, and the addresses of the U.S. posts in the country. **Travel Warnings** are issued when the State Department recommends that Americans avoid travel to a certain country. **Public Announcements** are issued as a means to disseminate information quickly about terrorist threats and other relatively short-term conditions overseas which pose significant risks to the security of American travelers. Free copies of this information are available by calling the Bureau of Consular Affairs at 202-647-5225 or via the fax-on-demand system: 202-647-3000. Consular Information Sheets and Travel Warnings also are available on the Consular Affairs Internet home page: http://travel.state.gov. Consular Affairs Tips for Travelers publication series, which contain information on obtaining passports and planning a safe trip abroad are on the internet and hard copies can be purchased from the Superintendent of Documents, U.S. Government Printing Office, telephone: 202-512-1800; fax 202-512-2250.

Emergency information concerning Americans traveling abroad may be obtained from the Office of Overseas Citizens Services at (202) 647-5225. For after-hours emergencies, Sundays and holidays, call 202-647-4000.

The National Passport Information Center (NPIC) is the U.S. Department of State's single, centralized public contact center for U.S. passport information. Telephone: 1-877-4USA-PPT (1-877-487-2778). Customer service representatives and operators for TDD/TTY are available Monday-Friday, 8:00 a.m. to 8:00 p.m., Eastern Time, excluding federal holidays.

Travelers can check the latest health information with the U.S. Centers for

Disease Control and Prevention in Atlanta, Georgia. A hotline at 877-FYI-TRIP (877-394-8747) and a web site at http://www.cdc.gov/travel/index.htm give the most recent health advisories, immunization recommendations or requirements, and advice on food and drinking water safety for regions and countries. A booklet entitled Health Information for International Travel (HHS publication number CDC-95-8280) is available from the U.S. Government Printing Office, Washington, DC 20402, tel. (202) 512-1800.

Information on travel conditions, visa requirements, currency and customs regulations, legal holidays, and other items of interest to travelers also may be obtained before your departure from a country's embassy and/or consulates in the U.S. (for this country, see "Principal Government Officials" listing in this publication).

U.S. citizens who are long-term visitors or traveling in dangerous areas are encouraged to register at the Consular section of the U.S. embassy upon arrival in a country by filling out a short form and sending in a copy of their passports. This may help family members contact you in case of an emergency.

### Further Electronic Information
**Department of State Web Site.** Available on the Internet at http://www.state.gov, the Department of State web site provides timely, global access to official U.S. foreign policy information, including Background Notes and daily press briefings along with the directory of key officers of Foreign Service posts and more.

Export.gov provides a portal to all export-related assistance and market information offered by the federal government and provides trade leads, free export counseling, help with the export process, and more.

STAT-USA/Internet, a service of the U.S. Department of Commerce, provides authoritative economic, business, and international trade information from the Federal government. The site includes current and historical trade-related releases, international market research, trade opportunities, and country analysis and provides access to the National Trade Data Bank.

This site is managed by the Bureau of Public Affairs, U.S. Department of State.
External links to other Internet sites should not be construed as an endorsement of the views contained therein.
**Copyright Information | Disclaimers**

UNCLASSIFIED//~~FOUO~~

# Personal Representative Review of the Record of Proceedings

I acknowledge that on <u>29</u> November 2004 I was provided the opportunity to review the record of proceedings for the Combatant Status Review Tribunal involving ISN #709.

<u>X</u> I have no comments.

___ My comments are attached.

████████████, USN
_____
Name

29 Nov 04
_____
Date

████████████
_____
Signature

ISN #709
Enclosure (5)

UNCLASSIFIED//~~FOUO~~