**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

ABU ABDUL RAUF ZALITA, et al.,

        Petitioners,

    v.

GEORGE W. BUSH, et al.,

        Respondents.

No. 05-CV-1220 (RMU)

---

**RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION FOR A**
**PRELIMINARY INJUNCTION PREVENTING PETITIONER'S REPATRIATION**
**FROM GUANTANAMO FOR AN ADDITIONAL SIXTY (60) DAYS**

Respondents oppose petitioner's Motion for Order Requiring Respondents to Provide

Counsel for Petitioner and the Court Sixty (60) Days' Advance Notice Before Rendition of

Petitioner From Guantanamo to Libya ("Pet'rs Mot.") (filed under seal with the Court Security

Officer on January 19, 2007).  The United States has compelling interests in not continuing to

hold Guantanamo detainees where their home countries are ready and willing to take

responsibility for them in accordance with their own laws, and in being able to repatriate or

transfer detainees when continued detention by the United States is no longer a military necessity

or appropriate.  Further, the United States has adopted policies and procedures to guard against

the transfer of Guantanamo detainees where transfer would raise unacceptable concerns that a

detainee might be mistreated.  Consistent with these interests, policies, and procedures, the

United States has made clear its intention to transfer petitioner to the control of his home

country, Libya, and has complied with this Court's earlier order requiring thirty days' advance

notice of the transfer.

Petitioner's counsel has raised concerns with respondents regarding petitioner's transfer.

Although respondents are permitted to transfer petitioner because thirty days have passed since

respondents provided the notice required by the Court, respondents notified petitioner's counsel on January 11, 2007 that litigation regarding petitioner's concerns could proceed on a normal preliminary injunction schedule assuming petitioner filed his motion to enjoin the transfer promptly.[1]  Pet'rs Mot. Ex. B.  Instead, having previously benefited from an injunction requiring thirty days' advance notice of petitioner's transfer, and with petitioner's counsel fully aware of respondents' policy of seeking repatriation of Guantanamo detainees to their countries of origin, petitioner filed this motion effectively seeking a further injunction prohibiting the United States from transferring petitioner for at least sixty days while his counsel takes additional time to prepare his case against transfer on the merits.

Because petitioner has failed to demonstrate why the Court should enter an order that requires petitioner's further detention, and because the United States' policies and procedures adequately address petitioner's alleged concerns regarding his transfer, the Court should deny this motion.

## BACKGROUND

### I.    Procedural History

A Combatant Status Review Tribunal ("CSRT") has determined that petitioner, a Libyan citizen, is an enemy combatant, and the Department of Defense ("DoD") is currently detaining petitioner at the Guantanamo Bay Naval Base in Cuba ("Guantanamo").  See Sept. 14, 2005 Factual Return (dkt. no. 4).  On June 22, 2005, petitioner filed a petition for a writ of habeas corpus (dkt. no. 1).  This Court subsequently issued an order on July 25, 2005 (dkt. no. 3)

---

[1] In communications with petitioner's counsel, undersigned counsel indicated that for petitioner's motion likely to provide the Court and the parties with sufficient time to litigate over petitioner's transfer concerns, petitioner should file his motion promptly under the preliminary injunction provisions set out in the Federal Rules of Civil Procedure and this Court's Local Rules.  Undersigned counsel is not in a position to identify further a specific date on which petitioner's transfer is likely to occur, although the transfer is now permissible given respondents' compliance with the thirty days' advance notice required by the Court.

requiring respondents to provide to the Court and counsel thirty days' advance notice of any intended removal of petitioner from Guantanamo.  Respondents filed such advance notice more than thirty days ago, on December 8, 2006 (dkt. no. 31), stating that

> [R]espondents . . . intend to release petitioner Abu Abdul Rauf Zalita (ISN 709) from the custody of the United States and repatriate him to Libya.  Specifically, petitioner will be transferred to the control of his home government for continued detention, investigation, and/or prosecution as that country deems appropriate, consistent with the policies and practices pertaining to such transfers as outlined in the declarations of Ambassador Pierre-Richard Prosper and Deputy Assistant Secretary of Defense for Detainee Affairs Matthew C. Waxman, as previously filed in other Guantanamo Bay habeas cases before this Court.

For the convenience of the Court, respondents have attached the declarations identified in their advance notice.  See Decl. of then Deputy Assistant Secretary of Defense for Detainee Affairs Matthew C. Waxman dated June 2, 2005 ("Waxman Decl."), attached hereto as Exhibit 1; Decl. of then Ambassador Pierre-Richard Prosper dated March 8, 2005 ("Prosper Decl."), attached hereto as Exhibit 2.[2]

## II.     The Repatriation and Transfer of Enemy Combatant Detainees at Guantanamo

Following the terrorist attacks of September 11, 2001, and pursuant to his powers as Commander in Chief and with congressional authorization, see Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), the President dispatched the United States Armed Forces to seek out and subdue the al Qaeda terrorist network and the Taliban regime, and others that had supported them.  In the course of those hostilities, the United States has taken custody of a number of foreign nationals as enemy combatants, some of whom like petitioner are being held at Guantanamo.

---

[2] Although Mr. Waxman and Mr. Prosper have both left office, the policies and practices set forth in their prior declarations remain in effect and are applicable to this case.  Certain numerical information in the declarations, however, is subject to updating.  See infra note 4.

Although the laws of war permit the United States to hold enemy combatants in detention for the duration of hostilities, the United States has no interest in detaining any individuals longer than necessary.  <u>See</u> Waxman Decl. ¶ 3; Prosper Decl. ¶ 2.  DoD conducts at least an annual review of each Guantanamo detainee to determine whether continued detention is warranted based on factors such as whether the detainee continues to pose a threat to the United States and its allies.  Waxman Decl. ¶¶ 3, 7; Prosper Decl. ¶ 2.  These annual reviews include those currently being conducted through Administrative Review Boards.  <u>See</u> Waxman Decl. ¶¶ 3, 7.[3] As part of the Administrative Review Board process, counsel who represent detainees have been invited to make written submissions concerning whether further detention is appropriate; in these submissions, counsel are free to raise, and in fact have raised, any concerns about transfer or repatriation.

Following consultation with various agencies, a senior DoD official grants the ultimate approval for the transfer of any Guantanamo detainee to the control of another government. Waxman Decl. ¶¶ 6-7; Prosper Decl. ¶¶ 2-3, 7.  As of the time of Mr. Waxman's Declaration, 234 Guantanamo detainees had been so transferred over a period spanning several years, including 167 transferred for release.  Waxman Decl. ¶ 4; <u>see also</u> Prosper Decl. ¶ 2.[4]

---

[3] <u>See generally</u> Memorandum of the Deputy Secretary of Defense dated May 11, 2004, re: Admin. Review Procedures for Enemy Combatants in the Control of the DoD at Guantanamo Bay Naval Base, Cuba, <u>available at</u> <<http://www.defenselink.mil/news/May2004/d20040518 gtmoreview.pdf>>; Memorandum dated Sept. 14, 2004, re: Implementation of Admin. Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, <u>available at</u> <<http://www.defenselink.mil/news/Sep2004/d20040914adminreview.pdf>>; Memorandum dated July 14, 2006, re: Revised Implementation of Admin. Review Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, <<http://www.defenselink.mil/news/Aug2006/d20060809ARBProceduresMemo.pdf>>.

[4] The numbers of detainees transferred from Guantanamo in respondents' declarations were accurate as of the dates of the declarations.  As of the date of this brief, approximately 380 detainees have been transferred by the DoD from Guantanamo since 2002.  <u>See, e.g.</u>, DoD News Releases <u>available at</u> <<http://www.defenselink.mil/news/nrdgb.html>>.

Where continued detention by the United States is not warranted, the United States may transfer a detainee to the control of another government, typically the government of his country of citizenship, for release. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3. The United States also transfers Guantanamo detainees, under appropriate circumstances, to the control of other governments for continued detention, investigation, and/or possible prosecution when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not pose a threat to the United States and its allies. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3. Such governments can include the government of a detainee's country of citizenship, or another country that may have law enforcement, prosecution, or other interest in the detainee. Waxman Decl. ¶ 3; Prosper Decl. ¶ 3.

Transfers to the control of other governments for continued detention, investigation, and/or prosecution occur after a dialogue between the United States and the receiving government, which may have been initiated by either the United States or the receiving government. Waxman Decl. ¶ 5. The purpose of such dialogue is to ascertain or establish what measures the receiving government intends to take, pursuant to its own domestic laws and independent determinations, which will ensure that the detainee will not pose a continuing threat to the United States and its allies. Id. In all cases where a transfer is consummated, the detainee is transferred entirely to the custody and control of the other government; once transferred, the individual is no longer in the custody or control of the United States. Id. Any future detention of that individual is by the foreign government pursuant to its own laws and not on behalf of the United States. Id. In fact, most of the Guantanamo detainees who have been transferred by DoD to the control of their home countries for continued detention, investigation, and/or prosecution have been released from detention some time after the transfer. Id.

For any transfer, a key concern is whether the foreign government will treat the detainee humanely and in a manner consistent with its international obligations.  Prosper Decl. ¶ 4; Waxman Decl. ¶¶ 6-7.  It is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured.  Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.  If a transfer is deemed appropriate, a process is undertaken, typically involving the Department of State, in which appropriate assurances regarding the detainee's treatment are sought from the country to whom the transfer of the detainee is proposed.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 5.  Once DoD initially approves a transfer and requests the assistance of the Department of State, the Department of State initiates transfer discussions with the foreign government concerned.  Waxman Decl. ¶ 6; Prosper Decl. ¶ 6.  Such discussions include an effort to seek assurances that the United States Government considers necessary and appropriate with regard to the country in question, including assurances of humane treatment and treatment in accordance with the international obligations of the foreign government accepting transfer.  Id.  Among other things, the Department of State considers whether the nation in question is a party to relevant treaties such as the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and pursues more specific assurances if the nation concerned is not a party or other circumstances warrant.  Id.

The determination whether it is more likely than not an individual would be tortured by a receiving foreign government, including, where applicable, evaluation of foreign government assurances, involves senior level officials and takes into account a number of considerations, including whether the nation concerned is a party to certain treaties; the expressed commitments of officials of the foreign government accepting transfer; the particular circumstances of the transfer, the country, and the individual concerned; and any concerns regarding torture that may

arise.  Prosper Decl. ¶¶ 6-8; Waxman Decl. ¶ 7.  Recommendations by the Department of State

are developed through a process involving the Bureau of Democracy, Human Rights, and Labor

(which drafts the Department of State's annual Country Reports on Human Rights Practices) and

the relevant Department of State regional bureau, country desk, or U.S. Embassy.  Prosper Decl.

¶ 7.  When evaluating the adequacy of assurances, Department of State officials consider the

identity, position, or other information concerning the official relaying the assurances; political

or legal developments in the foreign country concerned that provide context for the assurances;

and the foreign government's incentives and capacity to fulfill its assurances to the United

States.  Prosper Decl. ¶ 8.  In an appropriate case, the Department of State may consider various

monitoring mechanisms for verifying that assurances are being honored.  Id.  If a case were to

arise in which the assurances obtained from the receiving government were not sufficient when

balanced against treatment concerns, the United States would not transfer a detainee to the

control of that government unless the concerns were satisfactorily resolved.  Waxman Decl. ¶ 7;

Prosper Decl. ¶ 8.  Indeed, circumstances have arisen in the past where DoD decided not to

transfer detainees to their country of origin because of mistreatment concerns.  Waxman Decl. ¶

7; Prosper Decl. ¶ 8.

        The particulars of the discussions between the Executive Branch and foreign countries in

any specific case – including this one – are confidential.  The United States' ability to seek and

obtain assurances from a foreign government depends on its ability to treat its dealings with the

foreign government with discretion.  Prosper Decl. ¶ 9; Waxman Decl. ¶ 8.  Obviously,

diplomatic sensitivities surround the Department of State's communications with foreign

governments concerning allegations relating to torture.  Prosper Decl. ¶ 9; Waxman Decl. ¶ 8.

The United States Government typically does not unilaterally make public any specific

assurances or other precautionary measures obtained, because such disclosure would have a

chilling effect on and cause damage to this country's ability to conduct foreign relations.  Prosper

Decl. ¶ 9.  If the United States Government were required to disclose its communications with a

foreign government relating to particular mistreatment or torture concerns outside appropriate

Executive Branch channels, that government and potentially other governments would likely be

reluctant to communicate frankly with the United States concerning such issues in the future.[5]

Prosper Decl. ¶¶ 9-10; Waxman Decl. ¶ 8.  As a result, disclosure could impede our country's

ability to obtain vital cooperation from concerned governments with respect to military, law

enforcement, and intelligence efforts related to the war on terrorism.  Waxman Decl. ¶ 8; Prosper

Decl. ¶ 12.

In this case, respondents intend to transfer petitioner from the custody of the United

States to the control of Libya for any continued detention, investigation, and/or prosecution, as

that country deems appropriate.  As stated in respondents' advance notice filed with this Court

on December 8, 2006, petitioner's transfer has been arranged and is to be effected consistent

with the United States' policies and practices pertaining to such transfers as outlined in the

attached declarations.

---

[5] Another reason such disclosure would be harmful is that the Department of State's recommendation concerning transfer relies heavily on facts and analyses provided by Embassies and other Department of State offices, and confidentiality is necessary to ensure that the advice and analysis provided by those offices are useful and informative for the decision-maker. Prosper Decl. ¶ 11.  Disclosure of their assessments could chill important sources of information and interfere with the ability of our foreign relations personnel to interact effectively with foreign state officials.  Id.

**ARGUMENT**

**I.      The Court Lacks Jurisdiction to Consider Petitioner's Motion**

As an initial matter, the Court lacks jurisdiction over this action because the Military

Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 ("MCA"), which became law on

October 17, 2006, and the Detainee Treatment Act of 2005, Pub. L. No. 109-148, Tit. X, 119

Stat. 2680 ("DTA"), withdraw district court jurisdiction over cases brought by or on behalf of

alien enemy combatants regarding their detention.  The MCA amends 28 U.S.C. § 2241 to

provide that "[n]o court, justice, or judge shall have jurisdiction" to consider either (1) habeas

petitions filed by aliens detained by the United States as enemy combatants, or (2) any other

action "relating to any aspect of the detention, *transfer*, treatment, trial, or conditions of

confinement" of such aliens, except for the exclusive review mechanism in the D.C. Circuit

created under the DTA for addressing the validity of the detention of such aliens.  See MCA § 7

(emphasis added).  This new amendment to § 2241 took effect on the date of enactment and

applies specifically "to all cases, without exception, pending on or after the date of the enactment

of this Act which relates to any aspect of the detention, transfer, treatment, trial, or conditions of

detention of an alien detained by the United States since September 11, 2001."  Id.; see also

Hamdan v. Rumsfeld, No. 04-CV-1519 (JR), – F. Supp. 2d –, 2006 WL 3625015, at *2-3

(D.D.C. Dec. 13, 2006) (holding that the MCA removed statutory habeas jurisdiction in cases

such as this involving an alien detainee held at Guantanamo).

The Court also lacks jurisdiction over this case under the DTA.  In amending the habeas

statute, 28 U.S.C. § 2241, the DTA created an exclusive review mechanism in the Court of

Appeals to address the validity of the detention of aliens held as enemy combatants.

See DTA § 1005(e)(2), (e)(3).  Specifically, § 1005(e)(2) of the DTA states that the D.C. Circuit

"shall have exclusive jurisdiction to determine the validity of any final decision of a Combatant

Status Review Tribunal that an alien is properly detained as an enemy combatant," and it further

specified the scope and intensiveness of that review.[6]

Thus, even prior to enactment of the MCA, the DTA invested the Court of Appeals with

exclusive jurisdiction to determine the validity of any final CSRT determination that an alien is

properly detained as an enemy combatant, see DTA § 1005(e)(2), (e)(3), which, standing alone,

deprives the district court of jurisdiction in cases where, as here, the petitioner challenges his

detention as an enemy combatant.  It is well-settled that an exclusive-review scheme, where

applicable, precludes the exercise of jurisdiction under more general grants of jurisdiction,

including habeas.  *Cf.*, *e.g.*, 5 U.S.C. § 703 ("form of proceeding for judicial review is the special

statutory review proceeding relevant to the subject matter in a court specified by statute or, in the

absence or inadequacy thereof, any applicable form of legal action, including actions for . . .

writs of . . . habeas corpus"); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207-09 (1994)

("exclusive" jurisdiction under federal Mine Act precludes assertion of district court

jurisdiction); *FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984) (Hobbs Act) ("The

appropriate procedure for obtaining judicial review of the agency's disposition of these issues

was appeal to the Court of Appeals as provided by statute."); *Laing v. Ashcroft*, 370 F.3d 994,

999-1000 (9th Cir. 2004) ("§ 2241 is ordinarily reserved for instances in which no other judicial

---

[6] Section 1005(e)(2)(C) sets forth the scope of the Court of Appeals' review of CSRT
determinations.  It permits the Court to review "whether the status determination of the
Combatant Status Review Tribunal with regard to such alien was consistent with the standards
and procedures specified by the Secretary of Defense for Combatant Status Review Tribunals
(including the requirement that the conclusion of the Tribunal be supported by a preponderance
of the evidence and allowing a rebuttable presumption in favor of the Government's evidence)."
DTA § 1005(e)(2)(C)(i).  The Court may also review "whether the use of such standards and
procedures to make the determination is consistent with the Constitution and laws of the United
States," "to the extent the Constitution and laws of the United States are applicable."  *Id.*
§ 1005(e)(2)(C)(ii).

remedy is available"); *Lopez v. Heinauer*, 332 F.3d 507, 511 (8th Cir. 2003) ("Because judicial review was available . . . the district court was not authorized to hear this § 2241 habeas petition."). *See also Telecomm. Research & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984) ("even where Congress has not expressly stated that statutory jurisdiction is 'exclusive' . . . a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute") (footnote omitted); *id.* at 75, 78-79 (request for relief in district court that might affect Court of Appeals' future, exclusive jurisdiction is subject to the exclusive review of the Court of Appeals).

Because the Court lacks subject matter jurisdiction over this case based on the MCA or, in the alternative, based on the DTA's exclusive review scheme, it cannot grant the drastic relief requested by petitioner that would prevent the United States from relinquishing custody of petitioner. "'Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'"[7] Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998) (quoting Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868)).

---

[7] That the effect of the MCA and DTA is currently pending before the D.C. Circuit does not permit the Court to exercise jurisdiction to enjoin this transfer. Steel, 523 U.S. at 94. The pre-MCA decision in Al-Ghizzawi v. Bush, No. 05-CV-2378 (D.D.C.) (JDB) (dkt. no. 23) is not to the contrary. In Al-Ghizzawi, the Court granted petitioner's motion for a factual return after concluding that although the issue of the Court's jurisdiction remained unresolved, petitioner's counsel would eventually have access to factual returns either in this Court or in the Court of Appeals, and factual findings might be necessary to determine whether petitioner's challenge fell within the scope of the Court of Appeal's exclusive jurisdiction under the DTA. Id. at 3-4. After passage of the MCA, this Court's jurisdiction is no longer merely in doubt; rather, the MCA has explicitly and unambiguously withdrawn the district court's jurisdiction over pending habeas cases and vested exclusive jurisdiction in the Court of Appeals. See MCA § 7. Nor is there any doubt in this case that petitioner's action falls within the scope of the MCA's provisions divesting the district court of jurisdiction. These provisions, by their plain terms, apply to any habeas action filed by a petitioner "who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination," as well as "any other action . . . relating to any aspect of the . . . transfer . . . of such alien." MCA § 7.

II.     **Because Petitioner Fails to Satisfy the Requirements for a Preliminary Injunction, the Court Should Deny This Motion**

In requesting an additional sixty days' advance notice, petitioner invokes Federal Rule of Civil Procedure 65 governing injunctions, and granting petitioner's request would enjoin the United States from transferring petitioner during those sixty days.  Cf. Al-Anazi v. Bush, 370 F. Supp. 2d 188, 192 (D.D.C. 2005) ("Because such advance notice would be provided only after DOD has decided to transfer a detainee, petitioners concede, as they must, that they are essentially requesting an order preventing the United States from transferring any Guantanamo detainee for 30 days.").  Thus, although petitioner's motion resembles a motion for extension of time in form, petitioner seeks a preliminary injunction in effect, and therefore must satisfy the preliminary injunction standard.  Petitioner, however, does not address the standard for a preliminary injunction in his motion, much less argue that the standard is satisfied here.

It is well-established that a request for a preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  See Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004).  To prevail in a request for a preliminary injunction, a movant "must 'demonstrate 1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.'"  See Katz v. Georgetown Univ., 246 F.3d 685, 687-88 (D.C. Cir. 2001) (quoting CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)).  The irreparable harm that must be shown to justify a preliminary injunction "must be both certain and great; it must be actual and not theoretical."  Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).

Even if petitioner were to address the standard for a preliminary injunction, petitioner's motion does not come close to satisfying that standard.

A.      **Petitioner Cannot Demonstrate Irreparable Injury**

It is clear, at a minimum, that petitioner cannot demonstrate irreparable injury justifying a further delay of his transfer.  If the United States releases petitioner from its custody, petitioner will have received all the relief he can seek through habeas, and will have no further cognizable injury.  See Qassim v. Bush, 466 F.3d 1073, 1076-78 (D.C. Cir. 2006) (per curium) (granting appellees' emergency motion to dismiss because petitioners' habeas petition was rendered moot when petitioners were voluntarily released from Guantanamo to Albania); Almurbati v. Bush, 366 F. Supp. 2d 72, 80 (D.D.C. 2005) ("[O]nce the respondents release the petitioners from United States custody . . . they will have obtained the result requested [through habeas] and at that point there will be no further need for this Court to maintain jurisdiction."); Al-Anazi v. Bush, 370 F. Supp. 2d 188, 198 (D.D.C. 2005) ("Every habeas petition, including this one, is ultimately about obtaining release from detention, and where, as here, the United States will relinquish custody of the detainee to the home government there is nothing more the Court could provide to petitioners." (citation omitted)).  Thus, to the extent petitioner would argue that the requested injunction is necessary to preserve court jurisdiction over his challenge to the legality of his detention, any right to challenge the legality of one's detention cannot reasonably extend so far as to require that detention be continued, after the Executive determines that the military rationales for enemy combatant detention no longer warrant such custody, for no reason other than to be able to test the legitimacy of detention the Executive no longer is interested in maintaining.

The conclusion that release from United States custody will give petitioner all the relief he can seek through habeas is not altered by the fact that, upon being released from the custody of the United States, petitioner may be taken into custody and detained in the receiving country based on that country's independent interests and determinations. As respondents' attached declarations make clear, when DoD transfers a detainee to the control of another government, the detainee is no longer subject to the custody or control of the United States, and any subsequent confinement in the receiving country is based on the receiving government's decision, based on its domestic laws and interests, that the individual should be detained. Waxman Decl. ¶¶ 5, 9. Indeed, the United States' lack of control is exemplified by the fact that should the home government subsequently determine to release a transferred detainee, the United States would not be in a position to prevent it from doing so. "This Court has no authority to prevent a foreign sovereign from pursuing an independent law enforcement action against a detainee, or to order the United States to transfer a detainee to the country of his choosing." Al-Anazi, 370 F. Supp. 2d at 198 n.10.

Petitioner's counsel does assert what she terms a "good faith" belief that "it is more likely than not that [p]etitioner will be tortured and/or prosecuted upon any rendition to the custody of the Libyan government." Pet'rs Mot. at ¶ 10.[8] This belief does not demonstrate irreparable injury because, as explained above, a transfer likely to result in torture would be flatly contrary to the United States' policies and practices. Respondents' declarations of high-level government

---

[8] Counsel also asserts that this "belief can be substantiated by an Affidavit of [p]etitioner." Pet'rs Mot. at ¶ 10. Notably, petitioner's counsel met with petitioner for two days of meetings on December 19-20, 2006, approximately two weeks after respondents gave advance notice of the United States' intended transfer of petitioner. Pet'rs Mot. at ¶¶ 4-7. Counsel provides no explanation why she could not have procured an affidavit from petitioner during those meetings, or otherwise been in a position to make an evidentiary presentation supporting the requested injunction against petitioner's transfer at the time she filed the motion at issue here.

officials conclusively and unmistakably demonstrate that it is the policy and practice of the United States <u>not</u> to repatriate or transfer a detainee to a country when the United States believes, based on a number of factors and considerations, it is more likely than not that the individual will be tortured there.  <u>See</u> Prosper Decl. ¶ 4; Waxman Decl. ¶ 6.  The United States implements this policy through a process that contains several levels of precautions and safeguards.  To conclude that an injunction for an additional sixty days is nevertheless necessary would require the Court to assume that the United States' policies and practices are somehow a sham or pretext.  There is no valid basis for such an assumption.[9]  <u>Cf.</u> <u>Almurbati</u>, 366 F. Supp. 2d at 78 (holding that respondents' sworn declarations "directly refute the petitioners' allegations of their potential torture, mistreatment and indefinite detention to which the United States will in some way be complicit.")

Petitioner also cites administrative issues to justify the requested relief.  <u>See</u> Pet'rs Mot. ¶¶ 8-9 (petitioner's counsel did not receive her notes until after thirty days had elapsed since respondents' advance notice); <u>Id</u>. ¶ 10 (petitioner and petitioner's counsel have a meeting scheduled for February 1, 2007); <u>Id.</u> at ¶¶ 11-12 (petitioner's counsel is engaged in a "case-specific factual investigation" that requires additional time).  It has been counsel for Guantanamo detainees (including counsel for petitioner) that have requested, over respondents' objections, <u>thirty days</u>' advance notice in the Guantanamo cases.  Ironically, counsel for petitioner is now asserting that thirty days is inadequate.  Moreover, in order to join the issues more expeditiously,

---

[9] Similarly, the information cited by petitioner in Paragraph 4 of his motion is not inconsistent with the policies and practices of the United States as set forth in the Waxman and Prosper Declarations.  To the extent that petitioner attempts to portray the information as inconsistent, however, the information does not rebut the sworn declarations of two high-level government officials attesting to the specific policy of the United States <u>not</u> to transfer anyone to places where it is more likely than not that they will be tortured, and the specific steps that are taken to implement that policy with respect to detainees like petitioner.  <u>Cf.</u> <u>Almurbati</u>, 366 F. Supp. 2d at 78.

respondents accepted and evaluated a submission from petitioner's counsel detailing the basis for petitioner's objection to his transfer, before counsel's notes arrived. See Pet'rs Mot. ¶ 8. Similarly, petitioner's counsel has met with petitioner for two days already, and there is no reason to believe that a third meeting will substantially change petitioner's ability to litigate a preliminary injunction motion regarding petitioner's transfer. Simply put, petitioner has not articulated any legitimate reason why the Court should excuse petitioner from an appropriate demonstration of entitlement to the injunctive relief he seeks; therefore, the Court should not issue an injunction against respondents further delaying petitioner's transfer.

### B.    Petitioner Cannot Demonstrate a Likelihood of Success on the Merits

It is also clear that in addition to the irreparable injury prong, petitioner cannot demonstrate a likelihood of success in preventing his transfer from Guantanamo to Libya. Petitioner can point to no legal basis permitting the Court to review or interfere in the circumstances through which the United States relinquishes custody over petitioner. Indeed, as discussed above, the relinquishment from United States custody that would occur from petitioner's transfer represents the full extent of relief petitioner could obtain from his habeas petition. See supra [13-14].

Furthermore, if the Court were to entertain petitioner's claim to a right to contest his transfer, the Court would insert itself into the most sensitive of diplomatic matters, and doing so would be contrary to the long-established rule of non-inquiry. Most frequently applied in the extradition context, that rule, which "is shaped by concerns about institutional competence and by notions of separation of powers," bars courts from inquiring into "'the fairness of a requesting nation's justice system'" and "'the procedures or treatment which await a surrendered fugitive in the requesting country.'" United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir. 1997) (quoting

16

Arnbjornsdottir-Mendler v. United States, 721 F.2d 679, 683 (9th Cir. 1983)).  In that context, courts recognize that whether extradition should be denied on humanitarian grounds is a political matter, reserved to the Executive.  See generally Jacques Semmelman, Federal Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings, 76 Cornell L. Rev. 1198 (1991); see also People's Mojahedin Org. v. Department of State, 182 F.3d 17, 23 (D.C. Cir. 1999) (foreign policy decisions by the Executive "are political judgments, decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry" (quotation omitted)).

      If courts cannot, in the context of extradition, inquire into transfers of United States citizens to another country for criminal prosecution, they certainly cannot, in the context of an armed conflict, inquire into the repatriation of aliens held abroad in connection with that conflict. That inquiry would raise even greater separation-of-powers concerns than in the traditional extradition context, given that the decision to transfer involves an alien held abroad, rather than U.S. persons, including at times citizens, and occurs during an ongoing, armed conflict, which implicates the Executive's conduct of war making and foreign policy.  Moreover, even if judicial review did not ultimately result in an injunction against transfer, the mere inquiry into the United States' dialogue with foreign nations and into the terms of a transfer and any assurances that may have been obtained would cause grave harm.  See Prosper Decl. ¶¶ 9-12 (describing harms); Waxman Decl. ¶ 8 (same); see also Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 381 (2000) (expressing disapproval of acts that "compromise the very capacity of the President to speak for the Nation with one voice in dealing with other governments").

In addition, petitioner cannot argue that his transfer would violate certain international treaties, such as the Geneva Conventions, International Covenant on Civil and Political rights ("ICCPR"), Convention Against Torture and Other Cruel and Degrading Treatment and Punishment ("CAT"), or the United Nations Convention Relating to the Status of Refugees ("Refugee Convention").  These treaties do not give rise to judicially enforceable rights.  See, e.g., Sosa v. Alvarez-Machain, 542 U.S. 692, 734-35 (2004) (ICCPR); Castellano-Chacon v. INS, 341 F.3d 533, 544 (6th Cir. 2003) (Refugee Convention); In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443, 480 (D.D.C. 2005) (ICCPR and CAT); Khalid v. Bush, 355 F. Supp. 2d 311, 327 (D.D.C. 2005) (ICCPR and CAT); see also Johnson v. Eisentrager, 339 U.S. 763, 789 (1950) (holding that the 1929 Geneva Convention is not judicially enforceable by the captured party); Head Money Cases, 112 U.S. 580, 598 (1884) (treaties presumptively depend for "enforcement of [their] provisions on the interest and the honor of the governments which are parties to [them]") [10]; Al-Anazi, 370 F. Supp. 2d at 194 (rejecting petitioner's argument that the Foreign Affairs Reform and Restructuring Act of 1998, which implemented CAT in certain immigration-specific contexts, could serve as a legal basis for prohibiting or limiting transfer of wartime detainees to other countries); 8 U.S.C. § 1252(a)(4) (CAT claims are not cognizable in a habeas petition).  In any event, petitioner cannot point to any provision in these treaties that is in conflict with the United States' policies and procedures governing transfers of individuals

---

[10] The Supreme Court's recent holding in Hamdan v. Rumsfeld, 548 U.S. –, 126 S.Ct. 2749, 2794 (2006) is not to the contrary.  In Hamdan, the Court concluded that the petitioner in that case could invoke Article 3 of the 1949 Geneva Convention, not because the Convention's provisions provided the petitioner with enforceable rights, but because Article 3 was incorporated into a provision of the Uniform Code of Military Justice governing military commissions.  See Hamdan, 548 U.S. –, 126 S. Ct. at 2794 (assuming that the 1949 Conventions "would, absent some other provision of law, preclude [petitioner's] invocation of the Convention's provisions as an independent source of law binding the Government's actions and furnishing petitioner with any enforceable right").

detained at Guantanamo by DoD, or that would be violated by a transfer like this undertaken in accordance with those policies and procedures.

Because respondents have complied with this Court's order for thirty days' advance notice and have set forth their intention to transfer petitioner, and in light of the significant interests involved with transfers as described above and in the attached declarations, respondents respectfully request that the Court deny petitioner's motion.  In any event, given respondents' intention to proceed with the transfer in light of the satisfaction of the United States' policies and practices regarding transfers, respondents respectfully request that the Court act as soon as possible on petitioner's motion.

## CONCLUSION

For the foregoing reasons, respondents respectfully request that the Court deny petitioners' motion for a preliminary injunction requiring a further delay of at least sixty days before the United States may transfer petitioner.

Dated:  January 29, 2007                          Respectfully submitted,

                                                  PETER D. KEISLER
                                                  Assistant Attorney General

                                                  DOUGLAS N. LETTER
                                                  Terrorism Litigation Counsel

                                                    /s/ Nicholas A. Oldham
                                                  JOSEPH H. HUNT (D.C. Bar No. 431134)
                                                  VINCENT M. GARVEY (D.C. Bar No. 127191)
                                                  TERRY M. HENRY
                                                  JAMES J. SCHWARTZ
                                                  ROBERT J. KATERBERG
                                                  ANDREW I. WARDEN
                                                  NICHOLAS J. PATTERSON
                                                  EDWARD H. WHITE
                                                  NICHOLAS A. OLDHAM
                                                  Attorneys
                                                  *[Address on Next Page]*

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-2000
Fax:  (202) 616-8470

Attorneys for Respondents