

## UNCLASSIFIED

### THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

ABU ABDUL RAUF ZALITA *et al.*,      )
                                   )
          Petitioner,        )
                                   )
    v.                        )    No. 1:05 CV 1220 (RMU)
                                   )
GEORGE W. BUSH *et al.*,          )
                                   )
          Respondents.       )
                                   )

### MOTION FOR INQUIRY CONCERNING DESTRUCTION OF EVIDENCE RELATED TO CIA DETAINEE INTERROGATIONS

Petitioner Abu Abdul Rauf Zalita, a.k.a., Abdul Ra'ouf Omar Mohammed Abu Al Qassim ("Petitioner" or "Qassim"), by and through the undersigned counsel, moves for hearing to inquire promptly into the government's destruction of documents related to Petitioner's Combatant Status Review Tribunal ("CSRT").[1]  In particular, ███████████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

Interrogations of Abu Zubaydah and other CIA prisoners were videotaped; and the government destroyed the tapes.  Petitioner respectfully requests, therefore, that this Court inquire into the destruction of those tapes to determine whether they related to Petitioner.

---

[1] Pursuant to Local Rule 7(m), the undersigned counsel for Petitioner conferred with Respondents' counsel regarding the relief sought in this motion.  Respondents oppose this motion.

**UNCLASSIFIED**

## STATEMENT OF FACTS

Petitioner is a citizen of Libya who was kidnapped from his home in Karachi, Pakistan with his wife and child, handed over to U.S. military personnel and subsequently transferred to Guantanamo Bay Naval Station ("Guantanamo") in 2002. Petitioner has consistently maintained that he has never engaged in hostilities against the United States nor supports such acts. Despite Respondents' efforts since December 2006 to transfer Petitioner to the custody of the Qadhafi regime, where he faces certain persecution, torture or death, Qassim has remained imprisoned as an enemy combatant in Guantanamo for the past six years.

On September 29, 2004, following the Supreme Court's decisions in *Hamdi v. Rumsfeld*[2] and *Rasul v. Bush*,[3] Respondents convened a CSRT at Guantánamo to determine whether Petitioner was properly detained as an enemy combatant.



---

[2] 542 U.S. 507 (2004) (holding that U.S. citizens held as enemy combatants are entitled to due process that includes notice of the allegations against them and an opportunity to be heard before an independent tribunal).

[3] 542 U.S. 466 (2004) (holding that noncitizen enemy combatants, no less than American citizens, have a right to challenge their detention when imprisoned at Guantanamo).

[4] Incidentally,

**UNCLASSIFIED**   2

**UNCLASSIFIED**



Petitioner's CSRT thus made its final determination on January 23, 2005 that Petitioner was an enemy combatant properly detained in military custody at Guantánamo, and did not conduct any inquiry into whether ███████████████████████████████████████████
███████████████

Beginning on March 7, 2005, in other habeas petitions brought by Guantanamo detainees, the Court ordered respondents to "preserve and maintain all evidence and information regarding the torture, mistreatment, and abuse of detainees now at the United States Naval Base at Guantanamo Bay, Cuba." *See, e.g., Al-Marri v. Bush,* Civil Action No. 04-2035 (GK) [dkt no. 25], and *Abdah v. Bush,* Civil Action No. 04-1254 (HHK) [dkt. no. 155], attached hereto as Exhibits A & B. ███████████████████████████████████ *See* Declaration of Gitanjali S. Gutierrez, attached hereto as Exhibit C.

On June 22, 2005, Petitioner filed his petition for writ of habeas corpus and complaint for declaratory and injunctive relief challenging, *inter alia,* his detention as an "enemy combatant" at Guantánamo. [dkt. no. 1]  After Respondents' attempt to send Petitioner to the custody of the

# UNCLASSIFIED

Qadhafi dictatorship in December 2006, Qassim also moved for an injunction prohibiting Respondents from transferring him to the custody of Libya or any other country where he is more likely than not to be tortured or where he has a well-founded fear of persecution. This Court's denial of his motion on jurisdictional grounds was affirmed on appeal and Qassim's petition for certiorari in his interlocutory appeal is currently pending before the United States Supreme Court.[5]

On December 7, 2007, the *New York Times* reported that in November 2005, the CIA destroyed at least two videotapes documenting the interrogation of two detainees in the custody of the CIA, including videotapes of interrogations of Abu Zubaydah. *See* Mark Mazzetti, *Democrats Call for Inquiry Into Destruction of Tapes by C.I.A.*, NY Times, December 7, 2007. The Director of the CIA has acknowledged the destruction of the videotapes. *See* Exhibit D, Email from CIA Director Michael Hayden. At the same time, the government has not disclosed the content of the destroyed tapes or the content of what appears to be a significant number of remaining video or audio tapes in its possession.

Accordingly, Petitioner respectfully moves for a prompt hearing to determine whether evidence was destroyed that is relevant to the legal claims Petitioner raises in this matter.

## ARGUMENT

I.     **Respondents Violated Their Existing Obligation to Preserve Recordings of Interrogations**

Respondent's obligation to preserve documents and information concerning Guantánamo prisoners is not new. The obligation did not arise with the enactment of the DTA, the filing of this case or the ruling by the Court of Appeals for the District of Columbia in *Bismullah v. Gates*,

---

[5] On September 26, 2007, Petitioner also filed a petition under the Detainee Treatment Act, No. 07-1384 (D.C. Cir.), challenging the final decision of the Combatant Status Review Tribunal ("CSRT") that he is an "enemy combatant."



# UNCLASSIFIED

06-1197 & 06-1397 (D.C. Cir.), concerning the scope of the record on review in DTA actions. Since as early as February 2002 – before CIA interrogations of Abu Zubaydah and the unidentified CIA detainee – Respondents have had an obligation to preserve evidence justifying detentions of "enemy combatants" in Guantánamo, an obligation that has arisen as a direct result of ongoing litigation as well as congressional inquiries into CIA secret interrogation detention and "enhanced" interrogation practices.

In February 2002 several men detained at Guantanamo brought their first federal court challenge to their detention at Guantánamo.[6] Although not specific to Petitioner, these cases placed Respondents on notice that any information obtained from interrogations related to the detention of individuals at Guantanamo would be relevant to pending and future petitions for writ of habeas corpus and related litigation filed by detainees in Guantánamo.

This information was also relevant to ongoing federal criminal prosecutions. In the prosecution of Zacarias Moussaoui, for example, the government introduced into evidence statements that U.S. personnel derived from individuals detained as "enemy combatants" during interrogations in CIA and DOD custody. Beginning in 2003, the Moussaoui's defense lawyers requested access to any evidence related to these interrogations. In May 2003 and, again, in November 2005, the court in *Moussaoui* ordered the government to identify any videotapes or recordings of these interrogations by DOD and the CIA. *See* Letter from Chuck Robenberg, United States Attorney to Hon. Karen J. Williams and Hon. Leonie M. Brinkema, dated Oct. 25, 2007, attached hereto as Exhibit E.

Orders were also issued beginning in June 2005 by numerous judges in this Court requiring the government, which would include the CIA, to preserve all evidence and

---

[6] *See Rasul v. Bush*, 542 U.S. 466 (2004).

# UNCLASSIFIED

**UNCLASSIFIED**

information related to the torture, mistreatment and abuse of detainees at Guantánamo.[7]  The government has previously interpreted these preservations orders as applying to information "relating to all detainees *ever held* by the Department of Defense at Guantánamo Bay."  *See* Memorandum for Secretary of Defense, et al., from Daniel J. Dell'Orto, Acting General Counsel, Department of Defense (Dec. 19, 2007) (emphasis added), attached hereto as Exhibit F.  ███

███████████████████████████████████████████████

███████████████████████  Accordingly, these documents as well as any documents related to improper coercion or threats against the declarants should have been preserved for purposes of litigation.

In November 2005, the government indicted Jose Padilla, relying in part on information obtained through interrogations of individuals in CIA secret detention.  *See* David Stout, *U.S. Indicts Padilla After 3 Years in Pentagon Custody*, NY Times, Nov. 22, 2005.  These cases, while not specific to Petitioner, required Respondents to maintain the records related to the interrogations of Abu Zubaydah and the unnamed CIA detainee.

Developments in this case further required the government specifically to preserve evidence of the circumstances and details of interrogations ██████████████████████ ████████████████  Respondents relied upon this information as early as September 2004,

---

[7] *See e.g.*, Order, *Al-Marri v. Bush*, No. 04-2035 (GK) (D.D.C. Mar. 7, 2005) [dkt. no. 25]; Order, *Al-Shiry v. Bush*, No. 05-490 (PFL) (D.D.C. Mar 23, 2005) [dkt. no. 14]; Order, *Anam v. Bush*, No. 04-1194 (HHK) (D.D.C. June 10, 2005) [dkt. no. 124]; Order, *Abdah v. Bush*, No. 04-1254 (HHK) [dkt. no. 155]; Mem. Op. & Order, *El-Banna v. Bush*, No. 04-1144 (RWR) (D.D.C. July 18, 2005) [dkt. no. 36]; Mem. Op. & Order, *Slahi v. Bush*, No. 05-881 (RWR) (D.D.C. July 18, 2005) [dkt. no.10]; Mem. Op. & Order, *Zadran v. Bush*, No. 2367 (RWR) (D.D.C. July 19, 2006) [dkt. no. 36]; *cf. Al-Anazi v. Bush*, No. 05-345 (JDB) (D.D.C. Oct. 28, 2005) (denying motion for preservation as moot because "respondents have a pre-existing duty to preserve the very information that this motion addresses").
[8] *See* Gutierrez Declaration, ¶ 3.

**UNCLASSIFIED**



**UNCLASSIFIED**

when Petitioner's CSRT was conducted a year and two months prior to the destruction of the videotapes of Abu Zubaydah. Respondents finalized Petitioner's CSRT in January 2005, and expressly stated that ████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████ Petitioner also filed this habeas petition in September 2005, challenging his detention as an enemy combatant as well as invoking his right to *nonrefoulement*.[9] Unquestionably, the details ████████████████████████████████████████ ██████████████████ are at issue in Petitioner's habeas case and this Court should determine if relevant evidence has been destroyed.

Respondents' obligation to preserve evidence of Abu Zubaydah and the unidentified CIA detainee's interrogations was also heightened by congressional inquiries and administration officials' guidance. As early as 2003, officials within the CIA suggested destroying video recordings of CIA enhanced interrogations. *See* Mark Mazzetti, *C.I.A. Was Urged to Keep Interrogation Videotapes*, NY Times, Dec. 8, 2007. In response, in February 2003, the Chairman of the House Intelligence Committee and the ranking minority member of that committee expressly requested that the CIA preserve videotapes of its interrogations using enhanced techniques in secret facilities.[10]

Again, beginning in May 2005, a member of the Senate Select Intelligence Committee expressly requested that the CIA preserve over one hundred documents concerning the CIA

---

[9] *Refoulement* is a State's expulsion or return of an individual to another State where the person is in danger of torture or persecution. Respondents' improper designation of Petitioner as an "enemy combatant" has also heightened his concerns that he will be tortured or persecuted by the Qadhafi regime if transferred there and has increased this risk of harm due to the stigma of his enemy combatant status.

[10] *See* Mazzetti, *C.I.A. Was Urged to Keep Interrogation Videotapes*; Michael Isikoff & Mark Hosenball, *Who Authorized the CIA to Destroy Interrogation Videos?*, Newsweek, Dec. 11, 2007.



enhanced interrogation program. One of the requested documents is a report about the videotapes of interrogations and the possible illegality of the interrogation techniques the CIA employed. *See Chairman Rockefeller Says Intel Committee Has Begun Investigation into CIA Detainee Tapes*, Dec. 7, 2007, available at www.senate.gov/~rockefeller/news/2007/pr100707a.html.

Similarly, Administration officials sent requests to the CIA to preserve these records. *See, e.g.*, Mazzetti, *C.I.A. Was Urged to Keep Interrogation Videotapes* (White House Deputy Chief of Staff Harriet Miers repeatedly advised the CIA not to destroy the videotapes). Lawyers from the Department of Justice (DOJ) advised the CIA that it should not destroy any videotapes or recordings of detainee interrogations. *Id.* In mid-2005, the Director of National Intelligence "strongly advised" the Director of the CIA to forbid destruction of interrogation videotapes. *See* Isikoff & Hosenball, *Who Authorized the CIA to Destroy Interrogation Videos?*

Accordingly, without question, Respondents were under an obligation to preserve any evidence or information related to Petitioner that was derived from Abu Zubaydah or other CIA detainees. Respondents unquestionably violated that pre-existing obligation by destroying tapes in 2005.[11]

## II. Respondents' Ongoing Investigation Is Insufficient to Determine Whether Respondents Destroyed Evidence Related to Petitioner

Although Respondents have urged the courts and Congress to permit it to investigate itself, any investigation conducted by Respondents is insufficient to determine whether evidence

---

[11] Judge Kennedy recently held a hearing in *Abdah* to determine if Respondents violated their pre-existing obligation to preserve evidence. Although Judge Kennedy has not yet ruled on the *Abdah* petitioner's motion, here Petitioner has shown that the government explicitly relied upon statements ███████████████████████████████


**UNCLASSIFIED**

was destroyed that specifically related to Petitioner. The Department of Justice may have authorized the destruction of CIA interrogation tapes, creating an inherent conflict of interest that cannot be overcome.

Furthermore, CIA personnel have misrepresented the scope of the creation, preservation and destruction of recordings of CIA interrogations. Uncertainly exists, for example, concerning the public representations made by the Director of the CIA about the scope of the videotaping of CIA interrogations and the destruction and preservation of records. The Director recently asserted that "videotaping stopped in 2002." *See* Exhibit D. ████████████

████████████████████████████████████ The CIA has also not disclosed the content of the remaining videotapes or whether it destroyed videotapes of interrogations of other CIA detainees, ████████████████████████████

████████████

Concerns regarding the government's failure to provide an accurate and full accounting of both its destruction and possession of evidence or information concerning ████████████

████████████████████ are also raised by the government's representations in the *Moussaoui* prosecution. In *Moussaoui*, the government informed the court via declarations from CIA officials submitted on May 9, 2003 and November 14, 2005 that the CIA did not videotape interrogations of CIA detainees whose statements were relied upon by the government in that prosecution. *See* Exhibit E. On October 25, 2007, the government notified the court that these declarations were inaccurate and that CIA interrogations were videotaped. The government explained that "[u]nbeknownst to the authors of the declarations, the CIA possessed the three recordings at the time that the Declarations were submitted." *See id.*



UNCLASSIFIED

Although the government's letter to the court is heavily redacted, it suggests that the relevant CIA component did not inform the declarants of its videotaping of interrogations. *See id.* As result of the compartmentalization of information within the relevant government agencies and the need for accurate representations to the Court and counsel, this Court should require Respondents to demonstrate the preservation of relevant evidence through verified representations to this Court by individuals with direct knowledge of the creation, preservation and destruction of documents. Further, these representations should identify the relevant content of any destroyed evidence as well as the relevant content of any preserved evidence.

*          *          *

The government's factual return establishes that during Petitioner's CSRT, ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ were the purported basis for any association between Petitioner and al Qaeda or jihadist activity that the government now cites as justification for Petitioner's detention and enemy combatant status. Yet, any information impermissibly obtained through torture or coercion cannot justify Petitioner's detention or designation.[12] In this litigation, Petitioner must be afforded an opportunity to challenge any

---

[12] Our Nation's fundamental legal traditions prohibit judicial reliance upon statements extracted through torture and other lesser forms of impermissible coercion to justify imprisonment of an individual. *See, e.g.*, James Heath, *Torture and English Law*, 178 (1982) (torture has been illegal under English Common Law for more than 350 years). Common law judges did not consider evidence against a defendant that investigators extracted through torture and unlawful coercion because the judges considered this information inherently unreliable and viewed judicial acquiescence in these practices as degrading the dignity of justice. Our Founders shared this revulsion of judicial reliance upon statements extracted by torture or impermissible coercion and embodied protections against this practice within the Constitution. The Fifth Amendment's protection against self-incrimination was a direct response to the historical experience of the Star Chamber and intended to prohibit judicial reliance upon statements extracted through unlawful

UNCLASSIFIED



**UNCLASSIFIED**

impermissible reliance upon evidence obtained through or derived from torture to justify his detention. Accordingly, this Court should conduct an inquiry promptly to determine whether Respondents have destroyed evidence in a manner that eliminates Petitioner's ability to bring this challenge.

**CONCLUSION**

For the reasons stated above, this Court should conduct a hearing to determine whether Respondents destroyed evidence from Abu Zubaydah or other detainees in CIA custody related to Respondents' justification for detaining Petitioner and designating him as an "enemy combatant."

Respectfully submitted,

Gitanjali S. Gutierrez
J. Wells Dixon
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6485
Fax: (212) 614-6499

*Counsel for Petitioner*

---

cruelty or coercion, including torture. *See Michigan v. Tucker*, 417 U.S. 433, 440 (1974) ("The privilege against compulsory self-incrimination was developed by painful opposition to a course of ecclesiastical inquisitions and Star Chambers proceedings occurring several centuries ago."). Further, constitutional prohibitions against unreasonable searches and seizures, cruel and unusual punishments, and the guarantee of due process, reflect the Founders' antipathy to government cruelty and undue coercion within our Nation's justice system. *See, e.g., Gregg v. Georgia*, 428 U.S. 153, 169-170 (1976) ("The American draftsmen, who adopted the English phrasing in drafting the Eighth Amendment, were primarily concerned . . with proscribing 'tortures' and other 'barbarous' methods of punishment.") (citation omitted).



UNCLASSIFIED

Exhibit A

UNCLASSIFIED

 

UNCLASSIFIED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JARALLAH AL-MARRI, et al.,                 :

    Petitioners,                         :

    v.                                   :    Civil Action No. 04-2035 (GK)

GEORGE W. BUSH, et al.,                    :

    Respondents.                         :

## ORDER

On January 10, 2005, Petitioners filed a Motion for Discovery and for Preservation Order. Petitioners request that the Court order Respondents to preserve and maintain all evidence and information regarding the torture, mistreatment, and abuse of detainees at Guantanamo Bay. Respondents, however, argue that Petitioners have failed to satisfy the standard for entering a preliminary injunction, which is required when considering a request for a preservation order.

"[A] document preservation order is no more an injunction than an order requiring a party to identify witnesses or to produce documents in discovery." Pueblo of Laguna v. United States, 60 Fed. Cl. 133, 138 n.8 (Fed. Cl. 2004) (citing Mercer v. Magnant, 40 F.3d 893, 896 (7th Cir. 1994)). Thus, Petitioners need not meet such a standard when seeking a preservation order. Furthermore, Respondents represent that the information at issue will not be destroyed, so the Court finds that entering a preservation order



UNCLASSIFIED



will inflict no harm or prejudice upon them.  Accordingly, it is hereby

ORDERED that Petitioners' Motion for Preservation Order is **granted**; it is further

ORDERED that Respondents shall preserve and maintain all evidence and information regarding the torture, mistreatment, and abuse of detainees now at the Guantanamo Bay detention facility.


March 7, 2005                              /s/
                                Gladys Kessler
                                United States District Judge

Copies to:  Attorneys of Record via ECF


UNCLASSIFIED        2

UNCLASSIFIED

**Exhibit B**

UNCLASSIFIED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MAHMOAD ABDAH, et al.,

Petitioners,

v.                                    Civil Action 04-1254 (HHK)

GEORGE W. BUSH, et al.,

Respondents.

## ORDER

On January 10, 2005, petitioners filed a Motion for Leave to Take Discovery and For Preservation Order [#96]. On February 3, 2005, the court (Green, J.) ordered that the proceedings in this and ten other coordinated cases be "stayed for all purposes pending resolution of all appeals in this matter." To the extent that petitioners seek to take discovery, their motion must be stayed in accordance with Judge Green's order.

Petitioners also seek a preservation order, which they argue is necessary to ensure that the government will maintain "the very sensitive evidence it now possesses about the torture, mistreatment, and abuse of the detainees now at Guantánamo." Pet'rs' Mot. for Disc./Protective Order at 8-9. Respondents counter that petitioners have failed to satisfy the four-part preliminary injunction standard, which they assert is required for entry of a protective order; that petitioners have not identified specific documents at risk for destruction; and that respondents are "well aware of their obligation not to destroy evidence that may be relevant in pending litigation." Resp'ts' Opp'n at 25.

While preservation orders take the form of an injunction, in that they order a party to perform or refrain from performing an act, petitioners need not meet the four-part preliminary injunction test in order to protect relevant documents from destruction. In fact, "a document preservation order is

UNCLASSIFIED

no more an injunction than an order requiring a party to identify witnesses or to produce documents in discovery." *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 138 n.8 (Fed. Cl. 2004) (citing *Mercer v. Magnant*, 40 F.3d 893, 896 (7th Cir. 1994)); *see also Ditlow v. Shultz*, 517 F.2d 166, 173-74, n.31 (D.C. Cir. 1975) (preservation order issued when moving party presented "sufficiently substantial" challenge on the merits, non-moving party agreed to maintain documents at issue, and preservation of documents presented only a "limited housekeeping burden").

Furthermore, in this case, all of the documents relevant to the adjudication of petitioners' claims, along with petitioner-detainees themselves, are in the sole custody and control of respondents. In addition, petitioners' counsel's access to their clients is quite restricted. It is almost inconceivable that within these confines, petitioners could identify specific instances of document destruction. Rather, the court finds entry of a preservation order appropriate in light of the purpose animating Judge Green's February 3, 2005 stay order, namely to preserve the status quo pending resolution of appeals. Finally, because respondents represent that they will not destroy the information at issue, a preservation order will not impose any harm or prejudice upon them. *See Al-Marri v. Bush*, No. 04-2035 (D.D.C. March 7, 2005) (preservation order). Accordingly, it is this 10th day of June, 2005, hereby

ORDERED, that petitioners' motion is **STAYED** insofar as petitioners seek discovery and **GRANTED** insofar as they seek a preservation order; and it is further

ORDERED, that respondents shall preserve and maintain all evidence and information regarding the torture, mistreatment, and abuse of detainees now at the United States Naval Base at Guantánamo Bay, Cuba.


Henry H. Kennedy, Jr.
United States District Judge


2





UNCLASSIFIED

**Exhibit C**

UNCLASSIFIED



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ABU ABDUL RAUF ZALITA, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1220 (RMU) |
| | ) | |
| GEORGE W. BUSH, | ) | |
| President of the United States, *et al.* | ) | |
| | ) | |
| Respondents. | ) | |

## DECLARATION OF GITANJALI S. GUTIERREZ

I, GITANJALI S. GUTIERREZ, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am an attorney at the Center for Constitutional Rights, 666 Broadway, 7th floor, New York, New York, 10012 ("CCR").   CCR represents Abu Abdul Rauf Zalita, a.k.a. Abdul Rauf Omar Mohammed Abu Al Qassim, ("Petitioner"), Petitioner in the above-captioned matter. CCR also represents Guantanamo detainee Majid Khan ("Khan"), a U.S. asylee who was ███████ imprisoned and tortured ████████████████████ ████████████████ operated by the Central Intelligence Agency ("CIA"). *See Khan v. Bush*, Civil Action No. 06-1690 (RBW) (D.D.C.); *Khan v. Gates*, No. 07-1324 (D.C. Cir.). On September 6, 2006, the CIA transferred Khan from secret detention to the custody of military authorities at Guantánamo, where he remains imprisoned without charge or trial.   I have conducted attorney-client meetings with Majid Khan at Guantanamo in October and December 2007.   I respectfully submit this declaration in support of Petitioner's Motion for Inquiry Concerning Destruction of Evidence Related to CIA Detainee Interrogations.

 

UNCLASSIFIED

2.     Since his arrival at Guantánamo the only prisoner Khan has had any direct contact with is ████████ He and ████████ are in neighboring cells and share recreation time. Both men speak English.

3.     According to Khan,



4.     Khan was held in secret detention by or at the behest of the CIA from March 5, 2003 until on or around September 6, 2006. During his detention, CIA interrogators subjected him to enhanced interrogation techniques that amounted to torture.



I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:    Washington, DC
              December 27, 2007

Gitanjali S. Gutierrez



UNCLASSIFIED

UNCLASSIFIED

Exhibit D

UNCLASSIFIED

UNCLASSIFIED

## Starks, Brent

**From:** Remes, David
**Sent:** Saturday, December 08, 2007 7:40 PM
**To:** 'mfalkoff@niu.edu'; 'jasonmknott@yahoo.com'; Lipper, Gregory; Starks, Brent; Armijo, Enrique; Braverman, Elizabeth; Shuford, David; Vernia, Benjamin; Perryman, Skye; Huber, Jonathan
**Subject:** Mot Ex D

----- Original Message -----
From: Remes, David
To: Remes, David
Sent: Sat Dec 08 18:52:00 2007
Subject: Hayden Email

-----Original Message-----

Message from the Director: Taping of Early Detainee Interrogations

The press has learned that back in 2002, during the initial stage of our terrorist detention program, CIA videotaped interrogations, and destroyed the tapes in 2005. I understand that the Agency did so only after it was determined they were no longer of intelligence value and not relevant to any internal, legislative, or judicial inquiries-including the trial of Zacarias Moussaoui. The decision to destroy the tapes was made within CIA itself. The leaders of our oversight committees in Congress were informed of the videos years ago and of the Agency's intention to dispose of the material. Our oversight committees also have been told that the videos were, in fact, destroyed.

If past public commentary on the Agency's detention program is any guide, we may see misinterpretations of the facts in the days ahead.

With that in mind, I want you to have some background now.

CIA's terrorist detention and interrogation program began after the capture of Abu Zubaydah in March 2002. Zubaydah, who had extensive knowledge of al-Qa'ida personnel and operations, had been seriously wounded in a firefight. When President Bush officially acknowledged in September 2006 the existence of CIA's counter-terror initiative, he talked about Zubaydah, noting that this terrorist survived solely because of medical treatment arranged by CIA. Under normal questioning, Zubaydah became defiant and evasive. It was clear, in the President's words, that "Zubaydah had more information that could save innocent lives, but he stopped talking."

That made imperative the use of other means to obtain the information-means that were lawful, safe, and effective. To meet that need, CIA designed specific, appropriate interrogation procedures.

1

UNCLASSIFIED

Before they were used, they were reviewed and approved by the Department of Justice and by other elements of the Executive Branch. Even with the great care taken and detailed preparations made, the fact remains that this effort was new, and the Agency was determined that it proceed in accord with established legal and policy guidelines. So, on its own, CIA began to videotape interrogations.

The tapes were meant chiefly as an additional, internal check on the program in its early stages. At one point, it was thought the tapes could serve as a backstop to guarantee that other methods of documenting the interrogations-and the crucial information they produced-were accurate and complete. The Agency soon determined that its documentary reporting was full and exacting, removing any need for tapes. Indeed, videotaping stopped in 2002.

As part of the rigorous review that has defined the detention program, the Office of General Counsel examined the tapes and determined that they showed lawful methods of questioning. The Office of Inspector General also examined the tapes in 2003 as part of its look at the Agency's detention and interrogation practices. Beyond their lack of intelligence value-as the interrogation sessions had already been exhaustively detailed in written channels-and the absence of any legal or internal reason to keep them, the tapes posed a serious security risk. Were they ever to leak, they would permit identification of your CIA colleagues who had served in the program, exposing them and their families to retaliation from al-Qa'ida and its sympathizers.

These decisions were made years ago. But it is my responsibility, as Director today, to explain to you what was done, and why. What matters here is that it was done in line with the law. Over the course of its life, the Agency's interrogation program has been of great value to our country. It has helped disrupt terrorist operations and save lives. It was built on a solid foundation of legal review. It has been conducted with careful supervision. If the story of these tapes is told fairly, it will underscore those facts.

Mike Hayden

2

UNCLASSIFIED

UNCLASSIFIED

**Exhibit E**

 UNCLASSIFIED

NOV – 9 2007

TOP SECRET//HCS//ORCON/NOFORN//MR



U.S. Department of Justice U.S. DISTRICT C...
*United States Attorney*  ...ANDRI.., VIRGI...
*Eastern District of Virginia*

2100 Jamieson Avenue      (703)299-3700
Alexandria, Virginia 22314

FILED WITH THE
COURT SECURITY OFFICER
CSO: Madisso
DATE: 10/26/07

October 25, 2007

Hon. Karen J. Williams
Chief Judge
United States Court of Appeals
    for the Fourth Circuit
1100 East Main Street, Suite 501
Richmond, VA 23219-3517

Hon. Leonie M. Brinkema
United States District Judge
Eastern District of Virginia
401 Courthouse Square
Alexandria, Virginia 22314-5799

Hand-delivered via Court Security Officer

Re:    United States v. Zacarias Moussaoui
        Fourth Circuit Docket Nos. 03-4792, 06-4494
        District Court Case No. 01-455-A

Dear Chief Judge Williams and Judge Brinkema:

        The Government respectfully submits this letter to inform the Court that two *ex parte* declarations previously submitted by the Central Intelligence Agency ("CIA") in this case contain factual errors concerning whether interrogations of certain enemy combatants were audio or video recorded. The errors, described more fully below, do not prejudice the defendant in light of his guilty plea, extensive admissions in the penalty phase, and the jury's decision not to impose a death sentence. We advise both Courts because the declarations in question were filed in the District Court and included in appendices filed in the Fourth Circuit.

Derived from: Multiple Sources
Declassify on: 25X1 Human

TOP SECRET//HCS//ORCON/NOFORN//MR

 UNCLASSIFIED



UNCLASSIFIED

Recently, we learned that the CIA obtained three recordings (two video tapes and one short audio tape) of interviews of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ We are unaware of recordings involving the other enemy combatant witnesses at issue in this case ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Further, the CIA came into possession of the three recordings under unique circumstances involving separate national security matters unrelated to the Moussaoui prosecution.

On September 13, 2007, an attorney for the CIA notified us of the discovery of a video tape of the interrogation of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ On September 19, 2007, we viewed the video tape and a transcript ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ of the interview. The transcript contains no mention of Moussaoui or any details of the September 11 plot. In other words, the contents of the interrogation have no bearing on the Moussaoui prosecution.[2] The existence of the video tape, however, is at odds with statements in two CIA declarations submitted in this case, as discussed in detail below.

After learning of the existence of the first video tape, we requested the CIA to perform an exhaustive review to determine whether it was in possession of any other such recordings for any of the enemy combatant witnesses at issue in this case. CIA's review, which now appears to be complete, uncovered the existence of a second video tape, as well as a short audio tape, both of which pertained to interrogations ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ On October 18, 2007, we viewed the second video tape and listened to the audio tape, while reviewing transcripts

---

[1] ▮▮▮▮▮▮▮▮▮ was one of the enemy combatant witnesses whom Moussaoui wanted to call to testify on his behalf; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[2] The recording from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[3] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Derived from: Multiple Sources
Declassify on: 25X1 Human



UNCLASSIFIED



UNCLASSIFIED

~~TOP SECRET//TICS//ORCON//NOFORN//MR~~                    Page 3 of 5

████████████████ Like the first video tape, the contents of the second video tape and the audio tape have no bearing on the Moussaoui prosecution — they neither mention Moussaoui nor discuss the September 11 plot. We attach for the Courts' review *ex parte* a copy of the transcripts for the three recordings.[5]

At our request, CIA also provided us with intelligence cables pertaining to the interviews recorded on the two video tapes. Because we reviewed these cables during our discovery review, we wanted to ensure that the cables accurately captured the substance of the interrogations. Based on our comparison of the cables to the ██████████ videotapes, and keeping in mind that the cables were prepared for the purposes of disseminating intelligence, we found that the intelligence cables accurately summarized the substance of the interrogations in question.

The fact that audio/video recording of enemy combatant interrogations occurred, and that the United States was in possession of three of those recordings is, as noted, inconsistent with factual assertions in CIA declarations dated May 9, 2003 (the "May 9 Declaration"), and November 14, 2005 (the "November 14 Declaration"). The May 9 Declaration arose after the Fourth Circuit directed the District Court to consider substitutions under the Classified Information Procedures Act ("CIPA") in lieu of enemy combatant testimony sought by the defendant. In an ensuing CIPA hearing, on May 7, 2003, Judge Brinkema ordered the Government to determine, *inter alia*, whether interrogations ███████████ were recorded. *See* 5/7/03 Tr. 11-13, 69. Two days later, the Government filed the May 9 Declaration, which was *ex parte* and accompanied by a motion under CIPA § 4 to make a limited disclosure to the defense of only the answers to the District Court's questions (but not the full explanations contained in the declaration). Judge Brinkema granted the § 4 motion, permitting the Government to make the following disclosure, among others, to the defense:

---

[4]    The transcript of the audio tape previously existed and was contained within an intelligence cable.

[5]    Although we have provided defense counsel with a copy of this letter, we have not provided them with a copy of the transcripts for two reasons. First, the interviews address other national security matters for which defense counsel lack a need to know. ███████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

~~Derived from: Multiple Sources~~
~~Declassify on: 25X1 Human~~

~~TOP SECRET//TICS//ORCON//NOFORN//MR~~



UNCLASSIFIED

Question:     Whether the interrogations ████████ are being recorded in
              any format?

Answer:       No.

*See* Docket No. 905 (Attachment A).[†]

  The November 14 Declaration arose after the Fourth Circuit published its decision in *United States v. Moussaoui*, 382 F.3d 453 (4ᵗʰ Cir. 2004), and after Moussaoui pleaded guilty. Following these events, and in anticipation of the penalty-phase trial, the District Court ordered the Government to disclose various information ████████████████████ including whether interrogations ██████████████████ were recorded. *See* 5/2/05 Order (Docket No. 1275). Judge Brinkema subsequently reconsidered most of that order, at the Government's request (*see* Docket No. 1282), but still directed the Government to "confirm or deny that it has video or audio tapes of these interrogations," *see* 11/3/05 Order (Docket No. 1359), at 4. The November 14 Declaration ensued, in which a CIA executive stated that the "U.S. Government does not have any video or audio tapes of the interrogations of ████████████" *See* 11/14/05 Declaration (Docket No. 1369), at 3.

  Unbeknownst to the authors of the declarations, the CIA possessed the three recordings at the time that the Declarations were submitted. We asked the CIA to ascertain the reason for such an error. ████████████████████ As best as can be determined, it appears that the authors of the Declarations relied on assurances of the component of the CIA that ████ ██████████████████████████████████████ unknowing that a different component of the CIA had contact with ████████████ ████████████████████

  As noted above, the errors in the CIA declarations at issue, although unfortunate, did not prejudice Moussaoui, who pled guilty, reiterated his guilt in substantial admissions in the penalty phase, and ultimately received a life sentence after the jury declined to sentence him to death.

---

  [†] This response was cited by the District Court in an opinion, dated May 15, 2003. *See* Docket No. 925, at 9. Both the response and the May 15 opinion were included in the classified Supplemental Joint Appendix filed with the Fourth Circuit at the same time. *See* SC 249, 273. The May 9 Declaration was included in the classified Supplemental *Ex Parte* Appendix filed with the Fourth Circuit on May 23, 2003, in docket number 03-4162. *See* SGX, at 17-25.

Derived from: Multiple Sources
Declassify on: 25X1-Human

UNCLASSIFIED



We bring the errors to the Court's attention, however, as part of our obligation of candor to the Court.

The Government will promptly apprise the Court of any further developments.

Sincerely,

Chuck Rosenberg
United States Attorney

By:

David Novak
David Raskin
Assistant United States Attorneys


cc:     Justin Antonipillai, Esq.
        Barbara Hartung, Esq.
        Appellate Counsel for Zacarias Moussaoui
        (without transcripts)

~~Derived from: Multiple Sources~~
~~Declassify on: 25X1 Human~~
~~TOP SECRET//ORU-GST//HCS//ORCON/NOFORN//MR~~



UNCLASSIFIED

**Exhibit F**

 UNCLASSIFIED



**DEPARTMENT OF DEFENSE**
**OFFICE OF GENERAL COUNSEL**
1600 DEFENSE PENTAGON
WASHINGTON, DC 20301-1600

DEC 1 9 2007

MEMORANDUM FOR SECRETARY OF DEFENSE
      DEPUTY SECRETARY OF DEFENSE
      SECRETARIES OF THE MILITARY DEPARTMENTS
      CHAIRMAN OF THE JOINT CHIEFS OF STAFF
      UNDER SECRETARIES OF DEFENSE
      DIRECTOR, OPERATIONAL TEST AND EVALUATION
      INSPECTOR GENERAL OF THE DEPARTMENT OF DEFENSE
      ASSISTANTS TO THE SECRETARY OF DEFENSE
      DIRECTOR, ADMINISTRATION AND MANAGEMENT
      DIRECTOR, PROGRAM ANALYSIS AND EVALUATION
      DIRECTOR, NET ASSESSMENT
      DIRECTOR, FORCE TRANSFORMATION
      DIRECTORS OF THE DEFENSE AGENCIES
      DIRECTORS OF THE DOD FIELD ACTIVITIES

SUBJECT: Preservation of Detainee Records

  In August 2005, in response to several orders issued by federal court judges, the General Counsel of the Department of Defense directed that certain information relating to all detainees ever held by the Department of Defense at Guantanamo Bay be preserved and maintained (enclosure). Specifically, you were directed to preserve and maintain "all documents and recorded information of any kind (for example, electronic records, written records, telephone records, correspondence, computer records, e-mail, storage devices, handwritten or typed notes) that is in, or comes into, your possession or control" relating to these detainees. Those directives remain in effect and must continue to be followed.

  You are hereby directed that this requirement also applies to records relating to detainees who arrived at Guantanamo after August 2005 and to any detainees who may arrive at Guantanamo in the future.

Daniel J. Dell'Orto
Acting General Counsel

Enclosure
As stated



UNCLASSIFIED